

Reed Smith LLP
1201 North Market Street
Suite 1500
Wilmington, DE 19801-1163
Tel +1 302 778 7500
Fax +1 302 778 7575
reedsmith.com

**Kurt F. Gwynne**
Direct Phone:  +1 302 778 7550
Email:  kgwynne@reedsmith.com

July 27, 2017

**VIA ECF/HAND DELIVERY**

Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

> RE: **National Bank of Anguilla (Private Banking & Trust) Ltd. v. National Bank of Anguilla, Ltd.,** *et al.***; Adv. Pro. No. 16-01279 (MG)**

Dear Judge Glenn:

      We write on behalf of debtor/plaintiff National Bank of Anguilla (Private Banking & Trust) Ltd. ("PBT"), in connection with the above-referenced adversary proceeding (the "Adversary Proceeding"), to advise of recent authority related to the motions to dismiss of defendants National Bank of Anguilla, Ltd., National Commercial Bank of Anguilla, Ltd., and the Eastern Caribbean Central Bank (collectively, the "Defendants"), scheduled to be heard on July 31, 2017.

      Specifically, enclosed for your consideration is the decision of the Honorable Kevin Gross, United States Bankruptcy Judge for the District of Delaware in the adversary proceeding *Emerald Capital Advisors Corp., in Its Capacity as Trustee for the FAH Liquidating Trust v. Bayerische Moteren Werke Aktiengesellschaft*, Adv. Pro No. 15-51898(KG), 2017 WL 2559892 (Bankr. D. Del. June 13, 2017). In *FAH Liquidating Trust*, Judge Gross adopted the reasoning of the Honorable Robert E. Gerber in *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127 (Bankr. S.D.N.Y. 2016) and found that Congress intended that Section 548 of the Bankruptcy Code applies extraterritorially. This is consistent with the position advanced by PBT in its opposition to Defendants' motions to dismiss.

Respectfully submitted,

Kurt F. Gwynne

Encl.

cc:    Appearing Counsel for Defendants (via ECF)

KFG:sjm

ABU DHABI ♦ ATHENS ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH
NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

US_ACTIVE-135610157.1

2017 WL 2559892
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Delaware.

IN RE: FAH LIQUIDATING CORP., et al., (f/k/a Fisker Automotive Holdings, Inc.), Debtors.
Emerald Capital Advisors Corp., in Its Capacity as Trustee for the FAH Liquidating Trust, Plaintiff,
v.
Bayerische Moteren Werke Aktiengesellschaft, Defendant.

Case No. 13–13087(KG)
|
Adv. Pro. No. 15–51898(KG)
|
Signed June 13, 2017

**Attorneys and Law Firms**

Mark Minuti, Saul Ewing LLP, Wilmington, DE, Plaintiff

Colm F. Connolly, Amy M. Dudash, Morgan, Lewis & Bockius LLP, Wilmington, DE, Samuel Rowley, P. Sabin Willett, Morgan, Lewis & Bockius LLP, Boston, MA, Defendant

## MEMORANDUM OPINION

KEVIN GROSS, U.S.B.J.

**\*1** The Court is addressing the defendant's motion to dismiss the Complaint (the "Motion to Dismiss"). Emerald Capital Advisors Corp., in its capacity as trustee (the "Trustee") for FAH Liquidating Trust, filed the Complaint in which it seeks to avoid, recover, and have turned over alleged constructively fraudulent transfers in the total amount of $32,579,798.87 (the "Transfers") under Bankruptcy Code Sections 542, 544, 548, and 550. The Trustee also seeks recovery under common law principles of unjust enrichment. The defendant, Bayerische Moteren Werke Aktiengesellschaft ("BMW"), moved to dismiss the Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), made applicable by Federal Rule of Bankruptcy Procedure 7012(b). For the reasons the Court explains in this Memorandum Opinion, the Court will grant the Motion to Dismiss in part and deny it in part.

## JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. The proceeding is core under 28 U.S.C. § 157. Venue in this District of Delaware is proper pursuant to 28 U.S.C. § 1409.

## FACTS [1]

[1] For the purposes of the Motion to Dismiss, the Court accepts all the Trustee's well-pled factual allegations in the Complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 664–65, 678–84 (2009). The Court may also rely on the documents attached as exhibits or incorporated by reference in the pleadings, and matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Over three years ago, on November 22, 2013, the Debtors [2] filed a petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtors were founded in 2007 to design, assemble, and manufacture premium plug-in hybrid electric vehicles in the United States. Declaration of Marc Beilinson, D.I. 3 ("Beilinson Decl.") ¶ 5. By October 2011, the Debtors began delivering for sale to the public the centerpiece of their operations: the Karma sedan. Beilinson Decl. ¶¶ 13, 17. Around that same time, the Debtors were developing a second platform, the "N" or "Nina Platform," to launch their second vehicle, the Atlantic sedan. *Id.* ¶ 18. To develop the Nina Platform, the Debtors entered into supply and service agreements with third-party vendors and suppliers, including BMW. *Id.* ¶ 18. The Debtors faced many difficulties that prevented them from operating as planned and caused them to seek bankruptcy relief, including safety recalls related to battery packs supplied by a third party vendor and the loss of their lending facility provided through the United States Department of Energy ("DOE"). *Id.* ¶¶ 5–12. The Debtors sold their assets with the Court's approval and on July 28, 2014, the Court entered an order confirming the Debtors' Plan. Through the Plan, the Debtors appointed the Trustee as their successor-in-interest and assigned to the Trustee all

of their possible causes of action, including those against BMW.[3]

[2] The Debtors are Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc. (collectively, the "Debtors").

[3] See Order Confirming Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (with Technical Modifications), Case No. 13–13087–KG, D.I. 1137, Art. IV.L; Supplement to the Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 13–13087–KG, D.I. 1071, Ex. B.

**\*2** At issue are payments made pursuant to two agreements between Debtors and BMW (the "Parties"). In April 2011, the Parties entered into the Preliminary Development Agreement (the "Development Agreement") "for the installation of BMW N26B20 engines with parts and components into a Fisker Nina vehicle ... for the purpose of securing the project's milestones with the view of the conclusion of a final Purchase, Supply and Development Agreement." Declaration of Samuel R. Howley, D.I. 16 ("Howley Decl.") Ex. A ¶ 1. Three months later, on July 8, 2011 the Parties entered into the Purchase, Supply and Development Agreement (N20 4–Cylinder Gasoline Engines, Parts and Components) (as subsequently amended, the "Supply Agreement," and together with the Development Agreement, the "Agreements") for "the supply of BMW N20B20 engines [ ], other standard BMW Powertrain and chassis parts and components ... for use in the Nina." Compl. ¶ 14; Howley Decl. Ex. B ¶ 1.1. In accordance with the sale of the Debtors' assets in the bankruptcy case, in May 2014, the Debtors rejected the Supply Agreement.[4]

[4] Notice of (A) Rejection of Certain Unexpired Leases and Executory Contracts, (B) Assumption of Certain Unexpired Leases and Executory Contracts, (C) And Extension of Retention Period with Respect to Certain Unexpired Leases and Executory Contracts, Case No. 13–13087–KG, D.I. 923.

The Agreements recognize that BMW is a corporation organized under the laws of the Federal Republic of Germany with its principal place of business at Petuelring 130, 80809 Munich, Germany. Compl. ¶ 13. Further, in the Agreements, the Parties included provisions specifying that they are governed by German law and that Munich should be the exclusive place of jurisdiction. Howley Decl. Ex. A ¶ 8.7, Ex. B ¶ 22.2.

Pursuant to the Development Agreement, the Parties agreed that Debtors would pay BMW for its services in three tranches: (1) €150,000.00 at signing, (2) € 250,000.00 "after successful engine start-up in vehicle and test bench," and (3) €300,000.00 on September 30, 2011. Id. Ex. A ¶ 6.2. Among other services required under the Development Agreement, BMW was to develop and deliver six prototype N26B20 engines and related parts. Id. Ex. A, Annex 3.

Pursuant to the Supply Agreement, Debtors would pay three, upfront, yearly installments of €22 million for a total of €66 million to BMW for expanding its production capacity as needed to manufacture 515,000 engines. Id. Ex. B, App. 5 ¶ 5.2.1. The upfront payments were to cover BMW's "structural invest [ment], machining, tooling, [and] development costs" and were to be paid to BMW "regardless of the actual volumes attained." Id. Ex. B, App. 5 ¶ 5.2.1. Also pursuant to the Supply Agreement, BMW "submitted to the direct oversight of, and agreed to make certain periodic reports to, the United States Department of Energy." Compl. ¶ 4.

In 2012, the Parties amended the Supply Agreement and modified the upfront payment schedule to reflect Debtors reduced forecast for production needs. Howley Decl. Ex. C, App. 5 ¶ 5.2.1. The new schedule identified Debtors' first €22 million payment made in 2011, relieved Debtors of their payment in 2012, and obligated Debtors to make payments of €7.5 million in 2013, €6.25 million in 2014, €5.0 million in 2015, and €1.25 million in 2016. Id.

According to the Agreements, Debtors made the following wire transfers in the total amount of $32,579,798.87 (collectively, the "Transfers")[5]:

- On or about June 30, 2011, a payment in the amount of $215,817.00;

- On or about July 29, 2011, a payment in the amount of $31,570,220.00;

- On or about December 20, 2011, a payment in the amount of $351,787.50;

- On or about April 4, 2012, a payment in the amount of $400,581.00; and

- On or about April 9, 2012, a payment in the amount of $41,393.37.

Compl. ¶ 15. BMW acknowledges that Debtors made all three tranche payments required under the Development Agreement on June 30, 2011, December 20, 2011, and April 4, 2011. Motion to Dismiss, at 7. BMW also identifies the July 29, 2011 payment as the 2011 upfront payment of €22 million required under the Supply Agreement.

[5] Debtors made the transfers in Euros and the stated Dollar amount is an approximation.

**\*3** The Trustee alleges that BMW did not manufacture or deliver to Debtors any engines pursuant to the Agreements or otherwise give any value to Debtors in exchange for the Transfers. Compl. ¶ 16. It further claims that BMW has not returned the Transfers or their value. *Id.* ¶ 17.

### Legal Standard

Rule 8(a)(2) provides that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); FED. R. BANKR. P. 7008. Accordingly, Rule 12(b)(6) allows a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); FED. R. BANKR. P. 7012(b). In doing so, the defendant bears the burden of proof to show the plaintiff has not stated a claim. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

In *Bell Atlantic Corp. v. Twombly* in 2007and *Ashcroft v. Iqbal* in 2009, the Supreme Court reexamined the Rule 8(a)(2) notice pleading standard in the context of a Rule 12(b)(6) motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In *Twombly*, the Supreme Court held that a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Supreme Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).

Later, in *Iqbal*, the Supreme Court clarified that the *Twombly* plausibility standard applies to all civil suits filed in federal courts and identifies two "working principles" underlying the *Twombly* decision. *Iqbal*, 556 U.S. at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

The Court will assess the Motion to Dismiss according to the framework provided by the Supreme Court and notes the observation of the Third Circuit that "[i]t remains an acceptable statement of the [Rule 8(a)(2) ] standard ... that courts 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief.' " *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

### DISCUSSION

**A. The Extraterritorial Application of Section 548**
The Trustee's first claim seeks to avoid certain of the Transfers as constructively fraudulent under Section 548(a)(1)(B). Before analyzing whether the Trustee has provided sufficient factual information to state a claim to avoid the Transfers, the Court needs to assess whether Section 548 can be applied to the Transfers. BMW argues that the avoidance powers of Section 548 do not apply to the Transfers because they were extraterritorial transactions, they occurred in Germany. The Trustee argues that the Transfers were not extraterritorial.

**\*4** There is a presumption against applying federal laws extraterritorially, "unless a contrary intent appears." *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010); *see Smith v. United States*, 507 U.S. 197, 204 (1993) (explaining that contrary Congressional

intent is shown "by the language of [the] statute and the legislative purpose underlying it"). Courts engage in a two-step inquiry when determining whether to apply the presumption against extraterritoriality. First, a court must determine whether the presumption applies by "identifying the conduct proscribed or regulated by the particular legislation in question" and by considering whether that conduct "occurred outside of the borders of the U.S." See *Societe Generale plc v. Maxwell Commc'n Corp. plc (In re Maxwell Commc'n Corp. plc)*, 186 B.R. 807, 816 (S.D.N.Y. 1995) ("*Maxwell I*"), aff'd on other grounds, 93 F.3d 1036 (2d Cir. 1996) ("*Maxwell II*"). Second, if the presumption is implicated, a court must examine the lawmakers' intent to determine whether Congress "intended to extend the coverage of the relevant statute to such extraterritorial conduct." *Id.*

After reviewing the Complaint, the Court finds that the Transfers were extraterritorial and adopts the reasoning of Judge Gerber in his decision in *Weisfelner v. Blavatnik (In re Lyondell)*, 543 B.R. 127 (Bankr. S.D.N.Y. 2016), where he held that "Congress' intent was to extend the scope of section 548 to cover extraterritorial conduct." *Lyondell*, 543 B.R. at 148. As such, the presumption of extraterritoriality does not prevent the Trustee's use of Section 548's avoidance powers in his first claim for relief.

*1. Whether the Transfers were Extraterritorial*

To determine whether the conduct regulated by the statute at issue occurred outside the borders of the U.S., many courts apply a "center of gravity" test, examining the facts of the case to see whether they have a center of gravity outside the United States. *See, e.g.*, *French v. Liebmann (In re French)*, 440 F.3d 145, 149 (4th Cir. 2006), cert. denied, 549 U.S. 815 (2006); *In re Florsheim Group Inc.*, 336 B.R. 126, 130 (Bankr. N.D. Ill. 2005). This "flexible" approach allows courts "to consider all component events of the transfers," *Maxwell I*, 186 B.R. at 816, including "whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic." *French*, 440 F.3d at 150. "It is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. *See also*, Mervyn's LLC v. Lubert–Adler Grp. IV, LLC (*In re Mervyn's Holdings, LLC*) 426 B.R. 488 (Bankr. D. Del. 2010) (applying most significant relationship test).

BMW argues that the subject of Count I, the Transfers in violation of Section 548, took place outside of the United States. BMW says that the Transfers were extraterritorial because they centered on development work undertaken by a German company pursuant to German contracts, which require the application of German law. Moreover, BMW highlights that it was to deliver the work in Germany in exchange for payment by Debtors in Euros. Therefore, claims BMW, the transfers are foreign transactions.

The Trustee responds that the Court should not solely focus on the fact that the Transfers were sent to BMW in Germany. Instead, the Court should consider that the Transfers originated from the United States, by a Delaware corporation headquartered in California, using funds provided by U.S. taxpayers through a DOE loan program. The Court notes that BMW disputes that the DOE earmarked its funds to pay BMW.

**\*5** A review of the allegations in the Complaint shows the center of gravity for the Transfers was Germany. The most compelling facts showing domestic activity—that the transfers originated in the United States from a Delaware corporation—are insufficient to overcome the primarily foreign nature of the Agreements. These include the milestones to be achieved at BMW's production facilities in Germany, the provisions mandating the forum for disputes as Munich, the applicable law being German, and payment required in Euros. *See, e.g.*, *Sherwood Investments Overseas Ltd., Inc. v. The Royal Bank of Scotland N.V. (In re Sherwood Investments Overseas Ltd., Inc.)*, 2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) (finding a transfer from a Swiss bank account to an English bank account to be extraterritorial even though the transfer was initiated from the U.S.).

*2. Whether Congress Intended Section 548 to Apply to Extraterritorial Transfers*

Finding the Transfers extraterritorial, the presumption against extraterritoriality is implicated. Now, the Court must examine the lawmakers' intent to determine whether Congress intended Section 548 to reach such foreign transfers. Recognizing that there is a split of authority, [6]

the Court adopts the reasoning in the *Lyondell* decision, holding that Section 548 applies extraterritorially.

6   *Compare Maxwell I*, 186 B.R. at 818–20 (holding that Congress did not clearly express an intent for Section 547 to allow a trustee to avoid foreign preferential transfers), *and Maxwell II*, 93 F.3d at 1054–55 (affirming *Maxwell I*, but applying principles of comity to hold that U.S. Courts must defer to the courts and law of the U.K. to hold that the avoidance powers should not apply to the transfers at issue), *and Spizz v. Goldfarb Seligman & Co. (In re Ampal–Am. Israel Corp.)*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (observing that the "Supreme Court read section 541(a) as a limitation on the trustee's avoiding powers, not as an expansion of those powers" and holding that the avoidance provisions—both Sections 547 and 548—do not apply extraterritorially), *with French*, 440 F.3d at 151–52 (holding that Section 548 "plainly allows a trustee to avoid any transfer of property that would have been 'property of the estate' prior to the transfer in question—as defined by § 541—even if that property is not 'property of the estate' now ... Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located.").

In *Lyondell*, the court observed that although "[t]he text of section 548 does not contain any express language or indication that Congress intended the statute to apply extraterritorially ... courts may look to 'context,' including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that statute to apply extraterritorially." 543 B.R. at 151.

The *Lyondell* court incorporated the reasoning of the Fourth Circuit in its *French* decision, where the court read Section 548 harmoniously with Section 541 to find that Congress expressed an intent for section 548 to apply extraterritorially:

Section 541 defines "property of the estate" as, *inter alia*, all "interests of the debtor in property."... In turn, [section] 548 allows the avoidance of certain transfers of such "interest[s] of the debtor in property."... By incorporating the language of [section] 541 to define what property a trustee may recover under his avoidance powers, [section] 548 plainly allows a trustee to avoid any transfer of property that *would have been* "property of the estate" prior to the transfer in question

as defined by [section] 541 even if that property is not "property of the estate" *now.*

*6 *French*, 440 F.3d at 152. After distinguishing other precedent and discussing a well-known commentator's analysis of the same, the court in *Lyondell* came to the following conclusion:

[S]ection 541(a)(3) of the Bankruptcy Code supports a finding that Congress intended section 548 to extend extraterritorially. Section 541(a)(3) provides that any interest in property that the trustee recovers under section 550 becomes property of the estate. Section 550 authorizes a trustee to recover transferred property to the extent that the transfer is avoided under either section 544 or section 548. It would be inconsistent (such that Congress could not have intended) that property located anywhere in the world could be property of the estate once recovered under section 550, but that a trustee could not avoid the fraudulent transfer and recover that property if the center of gravity of the fraudulent transfer were outside of the United States. It is necessary to rule as the *French* court did in order to protect the *in rem* jurisdiction of the bankruptcy courts over assets that Congress has declared become property of the estate when recovered under section 541(a)(3).

*Lyondell*, 543 B.R. at 154–55.

The Court agrees with the holding in *Lyondell*. The Court will therefore apply Section 548 extraterritorially to avoid the Transfers but, as explained below, only $793,761.87 can be avoided.

**B. The Claim for Constructive Fraud Under Bankruptcy Code Section 542, 548 and 550**
The Trustee's first, third, and fourth claims are for avoidance, recovery, and turnover of certain of the

Transfers as constructively fraudulent under Sections 548(a)(1)(B), 550, and 542.[7] The Trustee must allege three elements to state a claim under Section 548(a)(1)(B). He must allege first, that the transfers were made within two years of the Petition Date. 11 U.S.C. § 548(a)(1). Second, he must allege that the Debtors received less than reasonably equivalent value in exchange for the transfers. 11 U.S.C. § 548(a)(1)(i). Third, among the following three alternatives, he must allege that the Debtors: (1) were insolvent on the date that the transfers were made or became insolvent as a result of the transfers; (2) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (3) intended to incur, or believed that the Debtors would incur, debts that would be beyond the their ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(ii).

[7] Bankruptcy Code Section 550(a)(1) provides: "to the extent that a transfer is avoided under section ... 548 ... the trustee may recover, for the benefit of the estate, the property transferred, or ... the value of such property from the initial transferee of such transfer ...." 11 U.S.C. § 550(a)(1). As such, if the Trustee states a plausible claim for avoidance of the Transfers as constructively fraudulent under Section 548, the Trustee also states a plausible claim for recovery of the Transfers under Section 550. Also, to the extent that the Trustee states a plausible claim for recovery of the Transfers under Section 550, the Trustee also states a plausible claim for turnover of the Transfers under Section 542(a).

*1. Whether the Trustee Adequately Alleges that Certain of the Transfers Were Made Within Two Years of the Petition Date*

**\*7** The first element the Trustee must allege to state a Section 548 claim for constructive fraud is that Debtors made certain of the Transfers within two years of the Petition Date. BMW argues that the Trustee's Section 548 claim is limited by the two-year look back period, which would eliminate all but $793,761.87 of the total amount of the Transfers.

A review of the Complaint shows that Debtors made three wire transfers within two years of the Petition Date in the total amount of $793,761.87. Those transfers (using the November 22, 2013 Petition Date) are the December 20, 2011 wire transfer in the amount of $351,787.50, the April 4, 2012 transfer in the amount of $400,581.00, and the April 9, 2012 transfer in the amount of $41,393.37 (the "548(a)(1)(B) Eligible Transfers"). Based on the statutory look back period, the Trustee's Section 548 claim may only reach back to the 548(a)(1)(B) Eligible Transfers. As such, Trustee adequately alleges the first element of a Section 548 claim for constructive fraud as to the 548(a)(1)(B) Eligible Transfers. The Debtors made the remaining and larger Transfers more than two years before the Petition Date. Therefore, $31,786,216.13 cannot be avoided.

*2. Whether the Trustee Adequately Alleges that Debtors Received Less Than Reasonably Equivalent Value In Exchange For the Transfers*

The second element the Trustee must allege to state a Section 548 claim for constructive fraud is that Debtors received less than reasonably equivalent value in exchange for the Transfers. BMW argues that the Trustee fails to allege the absence of reasonably equivalent value because Debtors received reasonably equivalent value as a matter of law. BMW also highlights that the Trustee has not avoided the Agreements at issue here and therefore the Trustee cannot seek to avoid payments due under the Agreements. BMW argues that Debtors made the Transfers in satisfaction of antecedent debts owed under the Agreements, which constitute value. As such, BMW argues there can be no claim for constructive fraud

The Trustee responds that discovery will show that BMW did not provide the Debtors with "the equivalent of $33 million of value in exchange for the Transfers." Opposition to Motion to Dismiss, 14. The Trustee argues that BMW did not develop manufacturing facilities to produce the engines required by Debtors or otherwise provide any value to the Debtors or their estates. The Trustee also points out that courts liberally review claims for constructive fraud where the plaintiff is a third party outsider to the transfer like the Trustee is here. *See Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 WL 4239120, at *2 (Bankr. D. Del. Sept.16, 2008) ("A bankruptcy trustee, as a third party outsider to the debtor's transactions, is generally afforded greater liberality in pleading fraud.") (citation omitted). Lastly, the Trustee argues that questions as to reasonably equivalent value are not readily answerable upon a motion to dismiss given the factual issues involved.

The Court has observed that where a Trustee states a claim for constructive fraud, under the Rule 8(a)

pleading requirements "[a]ll that is needed at this stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." *In re DVI*, 2008 WL 4239120, at *9. Moreover, disputes as to the actual value of the transfer or value given in exchange for the transfer do not need to be decided on a motion to dismiss so long as "the Trustee has identified the transfer by date and face amount and has alleged that it was for no consideration." *Id.* at *8.

**\*8** A review of the Complaint shows that the Trustee alleges that the Debtors made the Transfers pursuant to the Agreements. The Complaint also alleges that BMW did not manufacture or deliver to Debtors the engines under the Agreements or otherwise provide any value to Debtors or the Debtors' estate. As such, the Court finds that the Trustee has adequately alleged the second element of a Section 548 claim for constructive fraud, that Debtors received less than reasonably equivalent value in exchange for the Transfers. Finding the element sufficient upon a motion to dismiss does not constitute a ruling on the merits, and as such the Court notes that the issue of "reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process." *Charys Liquidating Trust v. McMahan Sec. Co., L.P. (In re Charys Holding Co.)*, 443 B.R. 628, 638 (Bankr. D. Del. 2010).

 *3. Whether the Trustee Adequately Alleges Insolvency*
The third element the Trustee must allege to state a Section 548 claim for constructive fraud is that the Debtors were insolvent at the time of the Transfers. BMW argues that the Trustee fails to provide any factual allegations that would support a finding of insolvency, that the Trustee provides mere conclusory pleading, which must fail. The Trustee responds that the limited information available in public records shows that during the time period when Debtors made the Transfers, the Debtors were consistently and irrefutably insolvent.

Insolvency is a factual inquiry that often evades determination at the motion to dismiss stage. *See Halperin v. Moreno (In re Green Field Energy Svcs., Inc.)*, 2015 WL 5146161 *7 (Bankr. D. Del. Aug. 31, 2015) (explaining that the trustee-plaintiff need not provide a detailed valuation as to the timing of the debtors' insolvency at the motion to dismiss stage so long as there was some factual basis as to the debtors' financial condition).

Based on a review of the Complaint, the documents incorporated by reference in the pleadings, and matters of public record, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426, the Debtors began facing operating challenges as early as 2009 when they encountered delays in launching the Karma line. Beilinson Decl. ¶¶ 38–39. Even in the fall of 2011, when Debtors began selling the Karma sedan, the Debtors quickly faced another setback with their battery pack supplier effecting a recall. *Id.* at ¶¶ 40–41. Then a year later, the Debtors suffered losses when Hurricane Sandy destroyed almost all of Debtors' Karma inventory in the United States. *Id.* ¶ 42. All of these setbacks, which occurred during the time that Debtors made the Transfers, prevented Debtors from meeting milestones required under their DOE loan agreements. *Id.* ¶¶ 43–50. Although more detailed analysis may be required to prove insolvency at trial, the *Twombly* plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Twombly*, 550 U.S. at 556. Given *Twombly* and given the difficulty of discerning insolvency at the motion to dismiss stage, the Court finds that the Trustee adequately alleges the third element of a Section 548 claim for constructive fraud, and that the Transfers were made at time when the Debtors were insolvent or became insolvent as a result of the Transfers.

In sum, the Court concludes that the Trustee has adequately alleged each of the elements of a Section 548 claim for constructive fraud, but that the Trustee's claim is limited to the 548(a)(1)(B) Eligible Transfers as a result of the two-year look back period. For that reason, the Court will deny BMW's Motion to Dismiss the Trustee's Count I, III and IV claims for avoidance, recovery, and turnover of certain of the Transfers as constructively fraudulent or the $793,761.87 in Transfers and will grant the Motion to Dismiss for the remaining transfers of $31,786,216.13.

**C. The Claim for Constructive Fraud Under Bankruptcy Code Section 544(b)(1) and Applicable Non–Bankruptcy Law**
 **\*9** The Trustee's second claim (Count II) is for avoidance of the Transfers as constructively fraudulent under Sections 544(b)(1) and applicable non-bankruptcy law. As a threshold issue, the Court must determine whether German law or the California or Delaware Uniform Fraudulent Transfer Act ("UFTA") applies to the Section 544(b)(1) claim. The Parties agree that if German law were found to be the appropriate choice, the Trustee

would not have a remedy to avoid the Transfers under Section 544(b)(1). Both California and Delaware have adopted the UFTA. The elements to state a claim for constructive fraud under the UFTA mirror the elements required to state a claim for constructive fraud under Section 548(a)(1)(A), except that both California's and Delaware's UFTA extends the lookback period such that a cause of action must be brought within four years after the transfer was made. *See* CAL. CIV. CODE § 3439.04(a)(2)(A), 3439.09(b) (West 2017); DEL. CODE ANN. tit. 6, § 1304(a)(2), 1309(2) (West 2017).

The Court has explained that where it has jurisdiction and where competing laws conflict, "the Court should apply the 'most significant relationship' choice of law standard to determine which state law applies to the fraudulent transfer claim." *See Mervyn's LLC,* 426 B.R. 488, 496 n.6 (Bankr. D. Del. 2010) (citing *Travelers Indemn. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991) (adopting the "most significant relationship test"); *Pennsylvania Employee, Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010) (explaining the two-pronged inquiry to Delaware's choice of law approach). The Restatement (Second) of Conflict of Laws (the "Restatement") provides factors relevant to the most significant relationship test as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement § 6 (commentary to the rule states "[v]arying weight will be given to a particular factor, or to a group of factors, in different areas of choice of law").

The Restatement does not provide a general framework of the most significant relationship test for fraudulent conveyance actions as it does for tort actions or restitution actions, among other actions. *See* Restatement §§ 145, 221. Nonetheless, the frameworks for tort and restitution actions are similar and provide guidance here. The contacts to be considered in tort actions are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement § 145. Similarly, the contacts to be considered in restitution actions are: "(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (b) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit or enrichment was done, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment." Restatement § 221.

The Court will apply the Restatement's choice of law analysis to German law and the California and Delaware UFTA. Applying the factors in Sections 6, 145, and 221 of the Restatement, the Court finds that German law should control the Section 544(b)(1) claim. The following factors militate in favor of finding that German law applies: (1) the Agreements expressly provide that they are governed by German law with Munich, Germany, as the exclusive place of jurisdiction, (2) parties centered their relationship under the Agreements where BMW was to develop manufacturing facilities and produce engines for Debtors, and (3) the wire transfers originated from the United States, but were received in Germany, in Euros.

**\*10** In contrast, the only factors militating in favor of the application of the Delaware or California UFTA are that the Debtors were Delaware corporations with headquarters in California, that the funds may have included the proceeds of their DOE loan, and that the bulk of those harmed by the Transfers were within the United States. As explained by the District Court in *Pennsylvania Employee, Benefit Trust Fund*, the location of one party's headquarters in a particular forum "stands, at best, in equipoise with the residence/place of business of the [the other party's]." 710 F. Supp. 2d at 472. The fact that the overwhelming majority of Debtors' creditors who were

harmed by the Transfers are in the United States does not weigh more strongly than the other factors favoring application of German law.

Applying the general principles of the Restatement § 6 does not alter the conclusion that German law should apply. The Trustee's position is that it would not be able to pursue its claims because, among other reasons, the "relevant look-back period under German law would not reach the [ ] Transfers." Opposition to Motion to Dismiss, 8. But even were the California or Delaware UFTA to apply, the Trustee would not be able to reach back more than four years because of the timing of the Trustee's Complaint and UFTA's four-year lookback period. Here, the Complaint was filed on November 11, 2015. Debtors made the same three wire transfers within four years of the filing of the Complaint and within two years of the Petition Date in the total amount of $793,761.87. Those transfers are the December 20, 2011 wire transfer in the amount of $351,787.50, the April 4, 2012 transfer in the amount of $400,581.00, and the April 9, 2012 transfer in the amount of $41,393.37. As such, the Trustee's Section 544(b)(1) claim would only reach back to the same 548(a)(1)(B) Eligible Transfers. Moreover, application of German law better protects the "justified expectations" of the parties given the express provisions for disputes to be resolved in Germany applying German law. *See* Restatement § 6(d).

For these reasons, the Court concludes that German law applies to the Section 544(b)(1) claim and as such BMW's Motion to Dismiss Count II of the Complaint for avoidance of the Transfers as constructively fraudulent under Section 544(b)(1) will be granted.

**D. The Claim for Unjust Enrichment**
The Trustee's fifth claim (Count V) is for return of the Transfers with the Trustee claiming that BMW has unjustly retained the Transfers at the expense of the Debtors' estates. To state a claim for unjust enrichment sufficient to obtain restitution, the Trustee must allege five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citations omitted). The unjust enrichment claim is that BMW received a benefit, the Transfers, at the expense of the Debtors and it would be "against the fundamental principles of justice or equity and good conscience" for BMW to retain the Transfers. *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (internal quotations and citations omitted).

The Court previously held in another case that a claim for unjust enrichment can survive a motion to dismiss where it is plausible that the plaintiff's other claims may fail and leave the plaintiff without a remedy at law. *Halperin v. Moreno*, (*In re Green Field Energy Svcs., Inc.*), 2015 WL 5146161 at *10 (Bankr. D. Del. Aug. 31, 2015) (noting that in the event the trustee did not prove the insolvency element of its fraudulent transfer claims later in the proceedings, the trustee may be left without remedy provided by law).

*11 Here, the Trustee's claims in Counts I, III and IV of the Complaint are surviving the Motion to Dismiss only in minor part, namely, the sum of $793,761.87 of the $32,579,798.87 that comprise the Transfers. The Court has ruled that the Trustee filed the Complaint too late for the vast amount of the Transfers. However, the Trustee filed a claim for unjust enrichment (Count V) which the Court will not dismiss and which includes all of the Transfers.

BMW argues that "[t]he contractual relationship between Fisker and BMW AG bars the Trustee from recovering on an unjust enrichment theory." Defendants' Memorandum at 23. BMW cites cases in support of its position, including *Kuroda v. SPJS Holdings, L.L.C.*, 971 A. 2d 872, 891 (Del. Ch. 2009), and *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217 at *19–20 (Del. Ch. Sept. 18, 2014).

It is clear however, that at the pleading stage it is entirely acceptable to pursue alternative theories. *Lass v. Bank of Am., N.A.*, 695 F. 3d 129, 140 (1st Cir. 2012). It is also well established that a plaintiff may plead alternative claims for relief even where the pleading contains claims for breach of contract and unjust enrichment. *Pedrick v. Roten*, 70 F. Supp. 3d 638, 653 (D. Del. 2014) (*citing* Corbin on Contracts § 66.10 (2014) for the proposition that "[e]xpectancy damages and restitution will not ordinarily be given as concurrent remedies for the same injury, although they may be pleaded as alternatives"). The unjust enrichment claim in Count V is significant because it keeps alive the claim for the entire amount which the Trustee has placed at issue, namely, $32,579,798.87.

## CONCLUSION

The Trustee has brought the adversary proceeding to recover more than $32.5 million that Debtors transferred to BMW for what appears to be little or nothing. It remains unclear what, if any, Debtors received in return for the payments. The Trustee has some viable claims.

The Court will: (1) deny the Motion to Dismiss Counts I, III and IV as to $793,761.87 of the transfers, and grant the Motion to Dismiss Counts I, III and IV as to $31,786,216.13; grant the Motion to Dismiss Count II in its entirety; and deny the Motion to Dismiss Count V in its entirety.

**All Citations**

Slip Copy, 2017 WL 2559892

**End of Document**           © 2017 Thomson Reuters. No claim to original U.S. Government Works.