**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>NATIONAL BANK OF ANGUILLA<br>(PRIVATE BANKING TRUST) LTD.,<br><br>Debtor. | Case No. 16-11806 (MG)<br><br>Chapter 11 |
| NATIONAL BANK OF ANGUILLA<br>(PRIVATE BANKING TRUST) LTD.,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL BANK OF ANGUILLA,<br>NATIONAL COMMERCIAL BANK OF<br>ANGUILLA and EASTERN CARRIBEAN<br>CENTRAL BANK,<br><br>Defendants. | Adv. Pro. Case No. 16-01279 (MG) |
| In re:<br><br>CARIBBEAN COMMERCIAL<br>INVESTMENT BANK LTD.,<br><br>Debtor. | Case No. 16-13311 (SMB)<br><br>Chapter 11 |
| CARIBBEAN COMMERCIAL<br>INVESTMENT BANK LTD.,<br><br>Plaintiff,<br><br>v.<br><br>CARIBBEAN COMMERCIAL BANK<br>(ANGUILLA) LTD., NATIONAL<br>COMMERCIAL BANK OF ANGUILLA<br>LTD., and EASTERN CARRIBEAN<br>CENTRAL BANK,<br><br>Defendants. | Adv. Pro. Case No. 17-01058 (SMB) |

**MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO STAY THESE
ADVERSARY PROCEEDINGS BASED ON FORUM NON CONVENIENS AND
<u>INTERNATIONAL COMITY</u>**

*A P P E A R A N C E S:*

REED SMITH LLP
*Attorneys for the Plaintiffs and Debtors and Debtors in Possession*
*National Bank of Anguilla (Private Banking & Trust) Ltd. And*
*Caribbean Commercial Investment Bank Ltd.*
599 Lexington Avenue
New York, NY 10022-7650
By:    James C. McCarroll, Esq.
       Jordan W. Siev, Esq.
       Kurt F. Gwynne, Esq. (*pro hac vice*)

VINSON & ELKINS LLP
*Attorneys for Defendant Eastern Caribbean Central Bank*
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
By:    John C. Wander, Esq. (*pro hac vice*)
       Rebecca Lynn Petereit, Esq. (*pro hac vice*)
              and
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
By:    Marisa Secco, Esq. (*pro hac vice*)
              and
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
By:    Jessica C. Peet, Esq.

BROWN RUDNICK LLP
*Attorneys for Defendant National Commercial Bank of Anguilla, Ltd.*
Seven Times Square
New York, NY 10036
By:    David J. Molton, Esq.
       Daniel J. Saval, Esq.
       Gerard T. Cicero, Esq.

2

ALLEN & OVERY LLP
*Attorneys for Defendant National Bank of Anguilla Ltd. (in receivership)*
*and Defendant Caribbean Commercial Bank (Anguilla) Ltd. (in receivership)*
1221 Avenue of the Americas
New York, NY 10020
By:    Laura R. Hall, Esq.
         Justin L. Ormand, Esq.
         Rebecca R. Delfiner, Esq.

**STUART M. BERNSTEIN and MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGES**

## I.     INTRODUCTION[1]

This joint opinion addresses common issues raised by the *Motions to Dismiss* in two separate Adversary Proceedings—one pending before Judge Bernstein and the other pending before Judge Glenn.  The two Adversary Proceedings were filed in connection with two separate chapter 11 cases, one for each of two Anguilla "offshore banks" (as explained below).  The two Anguilla offshore banks failed between 2013 and 2016, and each Debtor Bank is the subject of a receivership proceeding and litigations pending in the Anguilla courts.  The same Foreign Representative in two separate chapter 15 cases (one for each Anguilla offshore bank) filed these chapter 11 cases after recognition of Anguilla receivership proceedings as foreign main proceedings.

The two chapter 11 cases were filed to enable the Foreign Representative to bring avoidance claims under federal and New York law, as 11 U.S.C. § 1521(a)(7) does not permit federal and state law avoidance claims to be brought in a chapter 15 case, and, as freely admitted by the Debtor Banks, Anguilla law does not recognize constructive fraudulent transfer claims.  The Defendants in these Adversary Proceedings, for the most part, are the same, counsel to the Plaintiffs and the Defendants are the same, and the briefs and arguments relating to the Defendants' *Motions to Dismiss* the two Adversary Proceedings are substantially the same.

Because of the common issues, arguments and counsel, we heard argument on the *Motions to Dismiss* together, and we decide the common issues together.  To be clear, however, while we reach the same resolution of the Motions, this joint Opinion reflects the separate opinion of each of us in our respective Adversary Proceeding.

---

[1]     Capitalized terms in the Introduction are defined below.

The *Motions to Dismiss* raise difficult issues of personal jurisdiction, subject matter

jurisdiction, *forum non conveniens*, international comity, Foreign Sovereign Immunities Act

defenses, extraterritorial application of federal and New York law, and the act of state doctrine.

We discuss the issues below, although we find it unnecessary, at this stage of these cases, to

resolve all of them.

We agree that the proper disposition of each case is a stay based on *forum non conveniens*

and international comity, pending decisions of issues raised or that can be raised, and more

appropriately should be raised and decided by the courts in Anguilla.

## II.    BACKGROUND

### A.    The Pleadings and Motions

National Bank of Anguilla (Private Banking & Trust) Ltd. ("PBT") filed an adversary

proceeding in this Court (the "PBT Adversary Proceeding," ECF Adv. Proc. No. 16-01279

(MG))[2] on December 16, 2016 (ECF PBT Doc. # 1), and filed an amended complaint (the "*PBT*

*Complaint*," ECF PBT Doc. # 32) on March 20, 2017 against the Eastern Caribbean Central

Bank ("ECCB," or the "Central Bank"), the National Bank of Anguilla Ltd. ("NBA"), and the

National Commercial Bank of Anguilla Ltd. ("NCBA," and together with ECCB and NBA, the

"PBT Defendants").  On April 27 and 28, 2017, the PBT Defendants filed the pending motions

to dismiss the *PBT Complaint* (the "*ECCB Motion to Dismiss the PBT Complaint*," ECF PBT

Doc. # 38; the "*NBA Motion to Dismiss the PBT Complaint*," ECF PBT Doc. # 41; and the

"*NCBA Motion to Dismiss the PBT Complaint*," ECF PBT Doc. # 44, and collectively, the "*PBT*

*Motions to Dismiss*").  The *PBT Motions to Dismiss* are supported by memoranda of law (the

"*ECCB (PBT) Memo*," ECF PBT Doc. # 39; the "*NBA Memo*," ECF PBT Doc. # 42; and the

---

[2]    For purposes of clarity, "ECF Doc. # __" refers to the electronic docket in Adv. Proc. No. 17-01058 (SMB)
(as defined below), and "ECF PBT Doc. # __" refers to the electronic docket in Adv. Proc. No. 16-01279 (MG).

"*NCBA (PBT) Memo*," ECF PBT Doc. # 45) and the declarations of William Richard Hare (the

"*Hare PBT Decl.*," ECF PBT Doc. # 47)[3] and Trevor Brathwaite (the "*Brathwaite PBT Decl.*,"

ECF PBT Doc. # 40).  PBT filed memoranda of law in opposition to the *PBT Motions to Dismiss*

on May 26, 2017 (the "*PBT Response to ECCB*," ECF PBT Doc. # 51; the "*PBT Response to*

*NBA*," ECF PBT Doc. # 49; and the "*PBT Response to NCBA*," ECF PBT Doc. # 50, and

collectively, the "*PBT Opposition*").  The *PBT Opposition* is supported by the declaration of

Eustella Fontaine (the "*Fontaine PBT Decl.*," ECF PBT Doc. # 52).  The PBT Defendants filed

reply briefs to the *PBT Opposition* (the "*ECCB (PBT) Reply*," ECF PBT Doc. # 57; the "*NBA*

*Reply*," ECF PBT Doc. # 54; and the "*NCBA (PBT) Reply*," ECF PBT Doc. # 55).

      Caribbean Commercial Investment Bank Ltd. ("CCIB," and together with PBT, the

"Plaintiffs," or the "Debtor Banks") filed an adversary proceeding (the "CCIB Adversary

Proceeding," ECF Adv. Proc. No. 17-01058 (SMB), and together with the PBT Adversary

Proceeding, the "Adversary Proceedings") by filing a complaint (the "*CCIB Complaint*," ECF

Doc. # 1, and together with the *PBT Complaint*, the "*Complaints*") on May 1, 2017 against

NCBA, ECCB, and the Caribbean Commercial Bank (Anguilla) Ltd ("CCB," and together with

NCBA and ECCB, the "CCIB Defendants," and together with the PBT Defendants, the

"Defendants," each a "Defendant").  On July 24, 2017, the CCIB Defendants filed the pending

motions to dismiss the *CCIB Complaint* (the "*CCB Motion to Dismiss the CCIB Complaint*,"

ECF Doc. # 12; the "*ECCB Motion to Dismiss the CCIB Complaint*," ECF Doc. # 18; and the

"*NCBA Motion to Dismiss the CCIB Complaint*," ECF Doc. # 15, and collectively, the "*CCIB*

---

[3]    Hare submitted the *Hare PBT Declaration* on May 3, 2017, as an amended declaration of one submitted on
April 28, 2017 (ECF PBT Doc. # 43), without exhibits.  The only difference between the two appears to be that the
original declaration was unsigned and the amended declaration was executed by Hare.  As all of the exhibits were
attached to the initial original, the Court will continue to refer to that version with the understanding that the failure
to sign it was an oversight.

Motions to Dismiss," and together with the *PBT Motions to Dismiss*, the "*Motions to Dismiss*,"

or the "*Motions*"). The *CCIB Motions to Dismiss* are supported by memoranda of law (the "*CCB Memo*," ECF Doc. # 13; the "*ECCB (CCIB) Memo*," ECF Doc. # 19; and the "*NCBA (CCIB) Memo*," ECF Doc. # 16) and the declarations of William Richard Hare (the "*Hare CCIB Decl.*," ECF Doc. # 14) and Trevor Brathwaite (the "*Brathwaite CCIB Decl.*," ECF Doc. # 20). CCIB filed memoranda of law in opposition to the *CCIB Motions to Dismiss* (the "*CCIB Response to CCB*," ECF Doc. # 24; the "*CCIB Response to NCBA*," ECF Doc. # 25; and the "*CCIB Response to ECCB*," ECF Doc. # 26, and collectively, the "*CCIB Opposition*"). The *CCIB Opposition* is supported by the declaration of Eustella Fontaine (the "*Fontaine CCIB Decl.*," ECF Doc. # 27). The CCIB Defendants filed reply briefs to the *CCIB Opposition* (the "*CCB Reply*," ECF Doc. # 29; the "*NCBA (CCIB) Reply*," ECF Doc. # 30; and the "*ECCB (CCIB) Reply*," ECF Doc. # 33).

On October 19, 2017, the Court entered an order (the "October 19, 2017 Order) in both Adversary Proceedings authorizing the parties to file additional memoranda of law addressing (1) whether the Bankruptcy Code abrogates sovereign immunity for ECCB over bankruptcy law avoidance claims under 548 and state law avoidance claims that can be asserted under section 544, and (2) whether any authority exists under Anguillan law in support of the contention that the Debtor Banks retained an interest in funds transferred from the Debtor Banks to the Defendants (ECF Doc. # 37; ECF PBT Doc. # 76). The Debtor Banks filed a joint supplemental memorandum in response to the order (the "*Debtor Banks Joint Supplemental Memo*," ECF Doc. # 42, ECF PBT Doc. # 81). The Defendants also filed a joint memoranda of law (the "*Defendants Joint Supplemental Memo*," ECF Doc. # 39, ECF PBT Doc. # 78), and ECCB filed another supplemental brief in response to the order (the "*ECCB Supplemental Memo*," ECF Doc. # 40, ECF PBT Doc. # 79).

B.    **Factual Background**

The facts surrounding these related Adversary Proceedings are taken primarily from the

well-pleaded allegations in the *Complaints*.[4]   The Court assumes the veracity of well-pleaded

facts when determining whether they plausibly give rise to a claim, *Pension Benefit Guar. Corp.*

*v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013) (citing *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 679 (2009)), and may also consider "documents attached to the complaint as

exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable*

*L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).   Additionally, where, as here,

defendants move to dismiss under the doctrine of *forum non conveniens*, the Court may consider

affidavits and exhibits in addition to the pleadings.   *Kitaru Innovations Inc. v. Chandaria*, 698 F.

Supp. 2d 386, 389–90 (S.D.N.Y. 2010); *accord Picard v. Estate (Succession) of Igoin*, 525 B.R.

871, 890 (Bankr. S.D.N.Y. 2015).

1.    *The Parties*

CCIB and PBT were incorporated and licensed in Anguilla under the Trust Companies

and Offshore Banking Act of Anguilla, (¶ 26; *PBT Compl.* ¶ 22), and operated as commercial

offshore banks (*i.e.* banks that operated within Anguilla, but served only non-Anguillan

customers). As offshore banks, CCIB and PBT were authorized only to accept deposits and remit

withdrawals in non-Eastern Caribbean currencies to individuals who were not residents of

Anguilla.  (*Brathwaite CCIB Decl.* ¶ 12; *Braithwaite PBT Decl.* ¶ 12.)  Approximately 120 of

PBT's depositors were located in the United States, accounting for 16% of deposits made with

---

[4]      Because the allegations in the *CCIB Complaint* and the *PBT Complaint* substantially overlap, the Court
relies primarily on the *CCIB Complaint*, and references to paragraphs therein are denoted with "(¶ _.)"  Where
necessary, the Court cites to each complaint individually.

PBT (*PBT Compl.* ¶ 22), and approximately 144 of CCIB's depositors were located in the United
Stated, representing 43% of CCIB's deposits.  (¶ 26.)

CCIB and PBT are wholly-owned subsidiaries, respectively, of CCB and NBA
(collectively, the "Parent Banks").  (¶ 27; *PBT Compl.* ¶ 23.)  NBA, which was the largest
financial institution in Anguilla (*Brathwaite PBT Decl.* ¶ 11) and CCB are incorporated pursuant
to the laws of Anguilla as private limited liability companies (¶ 27; *PBT Compl.* ¶ 23).  NBA, as
PBT's onshore parent company, managed the administrative and banking operations of PBT
pursuant to an agreement dated April 1, 2005 (the "PBT Service Agreement," *Braithwaite PBT
Decl.*, Ex. D.).  (*Brathwaite PBT Decl.* ¶ 21.)  Likewise, CCB managed the day-to-day affairs of
CCIB pursuant an agreement for service dated May 2010 (the "CCIB Agreement for Service,"
*Braithwaite CCIB Decl.*, Ex. D.).

NCBA is a newly-formed bank created in 2016, incorporated under the laws of Anguilla,
and wholly owned by the government of Anguilla.  (¶¶ 28, 34; *Fontaine PBT Decl.* ¶ 12.)  On
April 22, 2016, NCBA inherited NBA's and CCB's "valuable assets" as part of a "Resolution
Plan" (defined below).  (*PBT Compl.* ¶¶ 13, 52–53.)  According to William Hare, NCBA is "now
the only bank providing retail and commercial banking services in Anguilla."  (*Hare PBT Decl.* ¶
19.)

CCB, NBA, and NCBA are regulated by ECCB.  ECCB was established on October 1,
1983 under the Eastern Caribbean Central Bank Agreement Act R.S.A c. E5 (Anguilla) (the
"ECCB Act") as the monetary authority and regulator of the domestic banking system of the
territories of participating governments—Anguilla, Antigua and Barbuda, Commonwealth of
Dominica, Grenada, Montserrat, Saint Lucia, St. Kitts and Nevis, St. Vincent, and the
Grenadines.  (¶¶ 29, 40, 48, 66, 72.)  ECCB is headquartered in St. Kitts and Nevis and was

established to "maintain the stability of the Eastern Caribbean Currency and the integrity of the

banking system in order to facilitate the balanced growth and development of member states."

(*Hare PBT Decl.* ¶¶ 16–18.)  ECCB's regulatory authority over the participating governments is

found in Part IIA, Article 5B of the ECCB Act, which states if any of the participating territory's

financial system is in danger of disruption, substantial change, injury or impairment, then

[ECCB] has the express right to intervene into a financial institution of any of the participating

territories by assumption and control of that institution's property provided that:

> a. the interests of depositors or creditors of a financial institution
> are threatened;
>
> b. a financial institution is likely to become unable to meet its
> obligations or is about to suspend or has suspended payment to its
> creditors or depositors; or
>
> c. a financial institution is not maintaining high standards or
> financial probity or sound business practices.

(*Brathwaite PBT Decl.* ¶ 9 (citing ECCB Act at Art. 5B, Part IIA).)  ECCB has no regulatory

authority over the Debtor Banks.  (¶ 40; *PBT Compl.* ¶ 7.)  Instead, the Debtor Banks are

regulated by the Anguillan Financial Services Commission (the "FSC").  (¶ 59; *PBT Compl.* ¶ 7.)

## 2. *The Conservatorships*

The 2008 global financial crisis severely stressed the Eastern Caribbean banking sector.

(*Brathwaite PBT Decl.* ¶ 10.)  The effects of the crisis were especially pronounced in Anguilla,

where economic activity contracted and the country continued to experience negative growth

through 2012.  (*Id.*)  Anguillan commercial banks uniformly realized significant declines in

earnings and deterioration of capital levels.  (*Id.*)

In October 2011, ECCB and others began monitoring the affairs of the Parent Banks in

response to questions relating to the Parent Banks' viability.  (¶ 47; *PBT Compl.* ¶ 43.)  On

August 12, 2013, concerned by escalating non-performing loans, the Parent Banks' failure to

10

meet ECCB's capital requirements, and the likely inability of the Parent Banks to meet their obligations, ECCB placed each Parent Bank into conservatorship (the "Conservatorships") pursuant to powers conferred on ECCB under the ECCB Act.  (¶ 48; *PBT Compl.* ¶ 43.)  The stated aim of the Conservatorships was to stabilize and restructure the Debtor Banks.  (¶ 50; *PBT Compl.* ¶ 46.)  To accomplish that aim, ECCB appointed Conservator Directors (as defined below) to both CCB and NBA to prepare a rescue plan, and through the Conservator Directors, restricted access to CCB and NBA deposits.  (¶¶ 51, 53; *PBT Compl.* ¶¶ 47, 49.)

Following the implementation of the Conservatorships, ECCB removed the Parent Banks' directors and appointed Martin Dinning, Hudson Carr, Shawn Williams, and, for a short period of time, Robert Miller (each a "Conservator Director," and collectively, the "Conservator Directors") as conservators of the Parent Banks.  (¶ 52; *PBT Compl.* ¶ 7.)  Between August 12, 2013 and March 24, 2016 (the "Relevant Period"), the Parent Banks' affairs were conducted in accordance with instructions provided by the Conservator Directors (¶ 55; *PBT Compl.* ¶ 7), several of whom were or had been employees of ECCB (¶ 55), and who operated under the control and supervision of ECCB.  (¶ 52.)

On or about August 15, 2013, ECCB or Dinning, as Conservator Director acting on behalf of NBA and CCB, or Miller, Conservator Director acting on behalf of CCB, dismissed the appointed directors of PBT and CCIB.  (¶ 66; *PBT Compl.* ¶ 62.)  From August 15, 2013 until February 22, 2016, the Debtor Banks had no *de jure* directors and allegedly acted solely under the management control of the Conservator Directors.  (¶ 69; *PBT Compl.* ¶ 65.)  According to the Plaintiffs, the Conservator Directors presumed to act as directors of the Debtor Banks and were the sole persons causing the Debtor Banks to continue conducting regular banking business. (¶ 71; *PBT Compl* ¶ 67.)  For example, on September 10, 2013 and October 17, 2017, some of

the Debtor Banks' customers received correspondence from certain Conservator Directors advising them of operational changes at the Debtor Banks due to the takeover by ECCB, but stating that the Debtor Banks' operations would remain normal. (¶ 70; *PBT Complaint* ¶ 66.) The Conservator Directors also determined that funds were commingled between NBA and PBT and between CCIB and CCB, and specifically determined that some funds deposited in PBT and CCIB were transferred respectively to NBA and CCB. (*Brathwaite CCIB Decl.* ¶ 18; *Brathwaite PBT Decl.* ¶ 20.)

The Conservatorships, and ECCB and the Conservator Directors' alleged control over the Debtor Banks, continued from the Conservatorships' implementation until April 22, 2016, when the Debtor Banks were placed into receivership. (¶¶ 56–57; *PBT Compl.* ¶¶ 50–51; *see also Fontaine PBT Decl.* ¶ 9.)

            3.    *The Transfer of Funds*

The *Complaints*, in the main, allege that during the Relevant Period, the Conservator Directors assumed control of the Debtor Banks and, as *de facto* director, breached their fiduciary duties to the Debtor Banks by, among other things, "procur[ing] or permit[ting]" the payment (*i.e.*, "upstream") of each Debtor Bank's customer deposits to the respective Parent Bank's Bank of America ("BofA") accounts (collectively, the "Accounts) in New York.[5] More specifically, CCIB alleges that between August 12, 2013 and April 22, 2016, the Conservator Directors

---

[5]    The *Complaints* imply that the customers' deposits were initially held in accounts in the name of the Debtor Banks and subsequently transferred to accounts held in the names of the Parent Banks, giving rise to the Debtor Banks' alleged claims. However, neither PBT nor CCIB actually maintained accounts in the United States in their own names into which money could be deposited. (*See* ¶ 11; *PBT Compl.* ¶ 12.) Instead, anyone seeking to deposit U.S. dollars, directed those deposits in the first instance into accounts in the names of the Parent Banks at BofA. (Transcript of 10/26/17 H'rg ("Tr.") at 79:5–8; 85:14–21; 86:19–21.) The *CCIB Complaint* also alleges that CCIB had US$8,942,000 in a Morgan Stanley Smith Barney LLC ("Morgan Stanley") investment account in its own name, and that ECCB and the Conservator Directors liquidated that account and transferred the proceeds to CCB's BofA Account. (¶ 15.)

caused CCIB to transfer the net amount of US$4,481,394.62 in CCIB customer deposits to CCB's BofA Account.  (¶ 95.)  In addition, on November 8, 2013, the Conservator Directors liquidated US$8,942,000 in CCIB's Morgan Stanley investment account and transferred those funds to CCB.  (¶ 96.)  Likewise, PBT alleges that a net amount of US$9,150,168.84 in PBT customer deposits was upstreamed to NBA in the period between August 13, 2013 and March 23, 2016.  (*PBT Compl.* ¶¶ 94–97.)[6]  The transferred assets are referred to collectively as the "Funds."

Further, while the Debtor Banks allege that legal title to the Funds transferred to the Parent Banks when such Funds were deposited into the Accounts (¶ 76; *PBT Compl.* ¶ 72), the Debtor Banks contend that they maintained an equitable interest in the Funds in the Accounts because the Debtor Banks had no accounts in their own names and the Accounts, although in the Parent Banks' names, were also used as the Debtor Banks' operating accounts.  (¶ 76; *PBT Compl.* ¶ 72.)  According to the Debtor Banks, the Parent Banks "knowingly made no provision for repaying" the Debtor Banks and "did not provide any reasonably equivalent value or fair consideration for the Funds."  (¶ 76; *PBT Compl.* ¶ 72.)  The Debtor Banks contend that the Funds along with millions of other dollars were subsequently transferred to ECCB.  (*See* ¶¶ 97-100; *PBT Complaint* ¶¶ 98–100.)

In addition, the Debtor Banks contend that the Parent Banks, prior to and while under the management of the Conservator Directors, upstreamed millions of dollars to ECCB.  CCB allegedly transferred to ECCB (a) US$28,673,612.01 in the two years prior to CCIB's chapter 15 petition, (b) US$67,198,261.96 in the three years prior to CCIB's chapter 15 petition, (c)

---

[6]     At oral argument, counsel for the Parent Banks indicated that the transfers at issue in this case from the Debtor Banks to the Parent Banks were made in accordance with the existing service agreements.  (Tr. at 41:24–42:2.)

US$70,023,261.96 during the Conservatorship of CCB, and (d) US$87,933,896.76 during the

period between January 3, 2013 and April 18, 2016.  (¶¶ 97−100.)  Likewise, PBT alleges that

NBA transferred to ECCB the net amount of (a) US$12,120,348.30 in the two years prior to

PBT's chapter 15 petition, (b) US$11,872,446.40 during the Conservatorship of NBA, and (c)

US$27,572,446.40 in the period between January 2, 2013 and April 11, 2016, without receiving

reasonably equivalent value or fair consideration in exchange.  (*PBT Compl.* ¶¶ 98−100.)

The Plaintiffs argue that the upstreaming of the Debtor Banks' customers' deposits

provided liquidity to the Parent Banks during times when the Parent Banks were insolvent on a

balance sheet basis.  (¶¶ 77, 80; *PBT Compl.* ¶¶ 74, 77.)  However, the upstreaming rendered the

Debtor Banks insolvent and unable to pay their depositors during the Relevant Period.  (¶¶

81−89; *PBT Compl.* ¶¶ 79−86.)  The Debtor Banks' contemporaneous audited and unaudited

financial statements showed that they were insolvent during the Relevant Period. (¶¶ 85−88; *PBT

Compl.* ¶¶ 83−85.)

In addition, the Debtor Banks' customers were assured that any new funds deposited with

the Debtor Banks after August 12, 2013 would be available for withdrawal.  (¶ 91; *PBT Compl* ¶

88.)  But despite those assurances, on or around September 2, 2013, the Conservator Directors

placed restrictions on the Debtor Banks' customers' ability to make withdrawals.  (¶ 83; *PBT

Compl.* ¶ 81.)[7]

### 4.    *The Resolution Plan of 2016*

ECCB ultimately developed a plan in 2016 to resolve the Parent Banks' financial

problems (the "Resolution Plan").  The fairness of the Resolution Plan is currently the subject of

---

[7]        After his appointment, the Administrator (as defined below) sought written confirmation from ECCB and
the Conservator Directors that this assurance would be honored, (¶ 92; *PBT Compl.* ¶ 90), but did not receive it
despite numerous correspondence and calls among the parties.  (¶ 92(a)–(y); *PBT Compl.* ¶ 90(a)–(y).)

a judicial proceeding pending in Anguilla, and that proceeding is discussed in greater detail below.  On April 22, 2016, ECCB appointed a receiver of both Parent Banks (the "Receiver"), and the Parent Banks ceased banking operations in Anguilla.  (¶ 56; *PBT Compl.* ¶ 52.)  On that same day, the Parent Banks transferred to NCBA their banking operations, including the Funds in accounts held by the Parent Banks at BofA and which are the subject of this litigation.  (¶¶ 56−57; *PBT Compl.* ¶¶ 52−53.)  NCBA then transferred the Funds from the Accounts, in the name of the Parent Banks at BofA in New York, to another account under NCBA's control in June and July of 2016, without making any provision to repay the Debtor Banks.  (¶¶ 33, 57−58; *PBT Compl.* ¶¶ 29, 53−54.)  On July 8, 2016, the Funds held in the Account inherited by NCBA from NBA were frozen by BofA at the written request of PBT.  (*Hare PBT Decl.* ¶ 28−29.)

As shall be seen, the Debtor Banks contend that the Funds transferred out of the Accounts to the Parent Banks and ECCB "were held in constructive trust for the Debtor" (¶ 76; *PBT Compl.* ¶ 73), and that the Resolution Plan unfairly discriminated against them by failing to transfer their liabilities to NCBA because, among other reasons, the Debtor Banks' depositors were non-Anguillan residents.

### 5.    The Appointment of an Administrator of the Debtor Banks

Upon the FSC's application, the Supreme Court in the High Court of Anguilla (the "High Court") entered an order placing the operations of the Debtor Banks under administration pursuant to section 31(2)(b) of the FSC Act, R.S.A. c.F28 (the "Anguilla Administrations").  (¶ 60; *PBT Compl.* ¶ 56.)  On February 22, 2016, the High Court appointed William Tacon of FTI Consulting as the administrator of the Debtor Banks (the "Administrator," or the "Foreign Representative"), granting the Administrator complete control of the management of the Debtor Banks.  (¶ 61; *PBT Compl.* ¶ 57.)  The High Court specifically authorized the Administrator, as

an officer of the High Court, "to act in Anguilla or any foreign jurisdiction where he believes

assets and property of the Offshore Banks may be Situate[d] . . . [to] commence [or] continue . . .

without further order of this Honorable Court any proceeding or action . . . in a foreign

jurisdiction for the purpose of fulfilling his duties and obligations" under the February 22, 2016

order.  (¶ 62*; PBT Compl.* ¶ 58.)  At the close of business on April 25, 2016, the Debtor Banks

ceased accepting new deposits at the Administrator's direction.  (¶ 79; *PBT Compl.* ¶ 22.)

### C.    Procedural Background

Several pending proceedings in the United Stated and in Anguilla are relevant to the

Defendants' *Motions to Dismiss*.  In addition to the Anguilla Administrations of the Debtor

Banks pursuant to section 31(2)(b) of the FSC Act, R.S.A. c.F28, these pending proceedings

include: (i) the chapter 15 and chapter 11 proceedings of the Debtor Banks before this Court (the

"U.S. Proceedings"); (ii) the proceedings initiated by the Debtor Banks in Anguilla against the

Parent Banks and NCBA (the "Anguilla Initial Proceedings"); (iii) the proceedings commenced

by some of the Debtor Banks' depositors in Anguilla against the Conservator Directors and

ECCB (the "Satay Action"); and (iv) the proceedings initiated by the Debtor Banks against

ECCB and others seeking judicial review of the Defendants' conduct (the "Judicial Review,"

together with the Anguilla Initial Proceedings and the Satay Action, the "Anguilla Litigation").

### 1.    *The U.S. Bankruptcy Proceedings*

On May 26, 2016 and October 11, 2016, pursuant to the authority granted by the

Anguillan High Court, the Administrator filed chapter 15 petitions in this Court on behalf of PBT

(Case No. 16-11529-MG) and CCIB (Case No. 16-12844-SMB), respectively, seeking

recognition of the Anguilla Administrations.  By orders dated June 17, 2016 and November 15,

2016, this Court granted the petitions as to PBT (ECF Case No. 16-11529-MG) and CCIB (ECF

Case No. 16-12844-SMB), respectively, thereby recognizing the Anguilla Administrations as foreign main proceedings and the Administrator as the Debtor Banks' foreign representative.  At the time of the filing, the Administrator "anticipate[d] that calling for claims and subsequently admitting them to rank for dividend will take place in Anguilla as part of the Anguillan Proceeding[s] and my liquidation of [the Debtor Banks'] assets."  (*Declaration of William Tacon in Support of (I) the Verified Petition for Recognition of Foreign Proceeding and (II) Motion in Support of Verified Petition for Recognition of Foreign Proceeding and for Related Relief*, dated May 26, 2016 (the "*Tacon PBT Decl.*," ECF Case No. 16-11529-MG Doc. # 2) ¶ 36; *Declaration of William Tacon in Support of (I) the Verified Petition for Recognition of Foreign Proceeding and (II) Motion in Support of Verified Petition for Recognition of Foreign Proceeding and for Related Relief*, dated Oct. 6, 2016 (ECF Case No. 16-12844-SMB Doc. # 2) ¶ 35).

PBT and CCIB subsequently filed chapter 11 petitions, respectively, on June 22, 2016 (Case No. 16-11806-MG) and October 11, 2016 (Case No. 16-13311-SMB) for the ostensible purpose of filing federal avoidance actions against the Defendants.  On December 16, 2016 and May 1, 2017, PBT and CCIB filed these Adversary Proceedings.  With one exception, the *Complaints* are identical and seek identical relief.  They assert claims to (a) avoid and recover intentional or constructive fraudulent transfers under applicable provisions of the Bankruptcy Code, New York law and Anguillan law; (b) recover the avoidable transfers from NCBA and ECCB as subsequent transferees; (c) disallow claims of the Parent Banks, NCBA, and ECCB under section 502(d) of the Bankruptcy Code; and (d) impose liability against ECCB for breach of fiduciary duty, gross negligence, and aiding and abetting breach of fiduciary duty.

In addition to challenging the upstreaming of funds from the Debtor Banks to the Parent

Banks and NCBA, the *CCIB Complaint* also alleges that CCIB transferred approximately US$9

million to CCB from its Morgan Stanley account.  It does not appear, however, to include this

transfer in its avoidance claims which are limited to US$4,481,394.62, the net amount

upstreamed transfers effectuated through the BofA accounts.  (*See CCIB Complaint*, Counts V,

VIII, XI, XIV.)

2.    *The Anguilla Initial Proceedings*

On May 6, 2016, the Debtor Banks brought suit in the High Court of Anguilla against the

Parent Banks and NCBA.  (*See Debtor Banks' Statement of Claim*, *Hare CCIB Decl.*, Ex. B.)

The Debtor Banks made the same essential allegations as in the *Complaints*, namely, that the

Conservator Directors and ECCB breached their fiduciary duties in their capacity as *de facto*

directors of the Debtor Banks by transferring the Funds to the Parent Banks.  More specifically,

the Debtor Banks alleged that during their control, and while the Parent Banks were insolvent,

the Conservator Directors "procured or permitted the payment to, respectively, NBA and CCB of

all monies received by PBT and [CCIB] from depositors, and the proceeds of all assets of PBT

and [CCIB] realized or collected during the Relevant Period" (*id.* ¶ 11), in the amounts of US

$174,959,675.75 and US $26,983,662.05, respectively.  (*Id.* ¶ 13.)  PBT and CCIB contended

that the upstreamed funds "were received and held by NBA and CCB on trust for PBT and

[CCIB]," remained the Debtor Banks' assets, and the Debtor Banks were entitled to the return of

the funds and/or their traceable proceeds.  (*Id.* ¶¶ 15, 17.)  The Debtor Banks therefore sought

declaratory, equitable and monetary relief aimed at restoring the wrongfully upstreamed funds

and other transferred assets.  (*Id.* at 10−11.)  However, the Debtor Banks did not assert claims

under the Fraudulent Dispositions Act of Anguilla (the "Fraudulent Dispositions Act") against

18

any of the Defendants, and neither ECCB nor the Conservator Directors are parties to the Anguilla Initial Proceedings.

Because the Parent Banks were in receivership at the commencement of the Anguilla Initial Proceedings, a stay was in effect as to all legal proceedings against them under section 143(c) of the Banking Act 2015 (the "Banking Act").[8]  (*Hare PBT Decl.* ¶ 23.)  The Debtor Banks therefore required leave of the High Court to sue the Parent Banks.  They did not seek leave before initiating the action, and sought leave retrospectively.  Although it was in all parties' mutual interest to determine the Debtor Banks' claims, (*Leave Order*, *Hare CCIB Decl.*, Ex. C ¶¶ 84, 107(2)), and the refusal to lift the stay would leave the Debtor Banks unable to pursue their proprietary claims against the defendants (*id.* at ¶ 85), the High Court nevertheless refused to lift the stay, and the Debtor Banks' application was dismissed on August 24, 2016. (*Id.* ¶ 108.)

The principal reason for the dismissal was the Debtor Banks' failure to join the Conservator Directors as parties.  According to the High Court, the Debtor Banks' claims "raise[d] serious questions about the source of the powers under which the conservators of the defendants (appointed by ECCB) sought to exercise the powers they are alleged to have exercised over the claimants who are offshore banks regulated by the Anguilla Financial Services Commission ["FSC"] rather than the ECCB."  (*Id.* ¶ 93.)  Although the Debtor Banks alleged that the Conservator Directors breached their fiduciary duties to them and sought a remedy against them in the form of a declaration that they had breached their fiduciary duties,

---

[8]       Banking Act § 143(c) provides that upon the appointment of a receiver:

    All legal proceeding against the licensed financial institution or licensed financial holding company are stayed and a third party shall not exercise any right against the licensed financial institution's or licensed financial holding company's assets without the prior leave of the court unless the court directs otherwise.

the High Court noted that the Debtor Banks did not name the Conservator Directors as parties.

(*Id.* ¶ 95.)  The High Court found that "it [did] not appear . . . that the claimants [could] rightfully

seek or obtain a declaration against them that they acted in breach of the fiduciary duty" (*id.* ¶

99(5)), and without their presence, "the claim has very poor prospects of success."  (*Id.* ¶ 99(6);

¶¶ 107(5)−(6).)  The High Court concluded that the Conservator Directors were necessary

parties.  (*Id.* ¶ 99.)

The High Court explained that the dismissal of the Debtor Banks' application was also

justified by the Conservator Directors' possible immunity.  The defendants argued that the

Conservator Directors were immune from suit under Article 5F of the ECCB Act.[9]  (*See id.* ¶

100.)  The High Court stated that Article 5F only provided immunity for acts done by the

Conservator Directors in good faith and without negligence (*id.* ¶ 101), and explained that the

*Debtor Banks' Statement of Claim* failed to specifically plead bad faith or negligence necessary

to remove their claim from the immunity under Article 5F.  (*Id.* ¶ 106(1).)

The defendants also argued that the Conservator Directors were employees of ECCB, and

therefore immune from suit under Article 50(7)(i).[10]  The High Court questioned whether Article

50(7) even covered the Conservator Directors.  The immunity was not absolute, and in light of

the "constitutional concept of proportionality," the High Court had to decide whether the

immunity was inapplicable because the "the reliefs being sought fall outside that section on the

---

[9]      Article 5F of the ECCB Act provides:

The Council, or the Minister or the Bank, its directors and officers and any person appointed by
the Bank under Article 5B are not subject to any action. . . . in respect of anything done or omitted
to be done in good faith and without negligence in the performance or in connection with the
performance of functions conferred on the Bank under this Part.

[10]     Article 50(7)(i) of the ECCB Act states:

The Governor, the Deputy Governor, the appointed Directors, officers and employees of the Bank
shall be immune from legal process with respect to acts performed by them in their official
capacity except when the Bank waives this immunity.

basis that it constitutes a civil right." (*Id.* ¶¶ 104−05.)  Based on these considerations, the High

Court found that these issues "do not lend themselves to the court exercising its power without

giving the parties an opportunity to be heard and further detailed analysis." (*Id.* ¶ 106(2).)  The

Debtor Banks have appealed from the *Leave Order*. (*See Hare CCIB Decl.* ¶ 24; *Hare PBT*

*Decl.* ¶ 24.)

### 3.   The Satay Action

On June 28, 2016, fifty-one PBT depositors and seventeen CCIB depositors (the "Satay

Claimants") brought an action in the High Court against Conservator Directors Martin Dinning,

Hudson Carr, Shawn Williams, Robert Miller and ECCB (the "Satay Defendants"). (*Hare PBT*

*Decl.* ¶ 32.)  Their statement of claim (the "*Satay Statement of Claim*," *Hare CCIB Decl.*, Ex. D)

alleged the same set of facts as the *Complaints* and the *Debtors Banks' Statement of Claim*, but

asserted claims belonging to the Debtor Banks' depositors rather than the Debtor Banks.  In the

*Satay Statement of Claim*, the Satay Claimants asserted that they opened bank accounts with the

Debtor Banks (*Satay Statement of Claim* ¶ 4), and that ECCB placed the Parent Banks in

conservatorship on August 12, 2013 pursuant to its emergency powers under the ECCB Act, and

appointed the four individual defendants as Conservator Directors of the Parent Banks. (*See id.* ¶

6.)  The Satay Claimants alleged that as a result of the assumption of control over Parent Banks

by the Conservator Directors, the Conservator Directors became *de facto* directors of the Debtor

Banks and breached their duties to the Satay Claimants by, *inter alia*, failing to ensure the safety

and security of their deposits and the Debtor Banks' property. (*Id.* ¶¶ 24−27.).  The Satay

Claimants further contended that Conservator Martin Dinning misrepresented that their deposits

were safe and that they could continue to trade with their accounts. (*Id.* ¶ 27(h).)  As a result, the

Satay Claimants claimed that they could not access their funds deposited with the Debtor Banks

(*id.* ¶ 28), and under the Resolution Plan of 2016, the assets of the Debtor Banks, including the

Satay Claimants' deposits, were transferred to the newly constituted NCBA in breach of the

Anguillan Constitution and the European Convention on Human Rights.  (*Id.* ¶ 29.)  The Satay

Claimants further alleged that the Satay Defendants knowingly assisted the Government of

Anguilla in depriving the Satay Claimants of their money.  (*Id.* ¶ 30.)  The Satay Claimants

sought a money judgment in the sum of US$13,028,846.17 together with interest from August

2013 in accordance with the terms of their accounts.  (*Id.* at 8.)

The Satay Defendants filed an application on August 12, 2016 seeking a declaration that

the High Court lacked jurisdiction based on the Satay Defendants' statutory immunity.  (*See*

*Judgment*, dated Feb. 22, 2017 (the "*Satay Judgment*"), *CCIB Compl.*, Ex. A ¶¶ 9−10.)  The

Satay Defendants contended that ECCB was immune from suit under Article 50(2) of the ECCB

Act[11] (*id.* ¶ 10), and that the individual defendants were immune from suit pursuant to one or

more of ECCB Act Articles 50(7), and/or 5B(1)(vii).[12]  The thrust of the individual defendants'

position was that they acted under the mandate of ECCB to stabilize the Anguillan banking

system, and that their actions included the management and control of the Debtor Banks.  (*See*

*id.* ¶¶ 11−13.)  On the other hand, the Satay Claimants claimed that the defendants acted without

authority in managing and controlling the Debtor Banks (*see id.* ¶ 14), and that they were

therefore not entitled to immunity.  (*Id.* ¶¶ 30−31.)

---

[11]    Article 50(2) of the ECCB Act provides:

The Bank, its property and its assets, wherever located and by whomsoever held, shall enjoy
immunity from every form of judicial process except to the extent that it expressly waives its
immunity for the purpose of any proceedings or by the terms of any contract.

[12]    Article 5B(1)(vii) is part of the 1993 amendments to the ECCB Act, and is annexed to the *Braithwaite*
*CCIB Declaration* as Exhibit B.  It grants ECCB authority "to appoint such persons and to establish such companies
or corporations as it considers necessary to assist in the performance of the functions conferred [under Article 5B];
and the provisions of Article 50 [*e.g.*, immunity from suit] shall apply to such persons, companies or
corporations[.]"

On February 22, 2017, the High Court issued the Satay Judgment and held that the Satay

Defendants had acted *ultra vires*.  Although ECCB could, under appropriate circumstances,

exercise control over the financial institutions it regulated (*e.g.*, the Parent Banks), the High

Court found that it could only "investigate the affairs" of the affiliated financial institutions, here,

the Debtor Banks.  (*Id.* ¶¶ 33, 64, 66).  The High Court found that ECCB and the individual

defendants had exceeded their powers with respect to the Debtor Banks, including by hiring and

laying off the Debtor Banks' officers and employees and replacing them with the Conservator

Directors, and by sending letters to the Debtor Banks' depositors regarding the restrictions on

their withdrawals and the revisions of the interest rates on their deposits.  (*Id.* ¶¶ 61−62.).

Since the Satay Defendants did not possess the authority to act as they did with respect to

the Debtor Banks, the High Court concluded that immunity under Article 50 did not apply.  (*Id.* ¶

67)  The High Court further found that the applicability of Article 5F, which immunizes acts

taken in good faith and without negligence, could only be determined "after a full ventilation of

the facts of the case."  (*Id.* ¶ 69.)  The Satay Defendants' jurisdictional objection was therefore

"refused," and they were directed to serve their defense.  (*Id.* ¶ 70.)  The *Satay Judgment* did not

address whether the Parent Banks could have lawfully taken the challenged actions in their

capacities as sole shareholders of the Debtor Banks.  (*Hare CCIB Decl.* ¶ 31; *Hare PBT Decl.* ¶

35.)  ECCB and the Conservator Directors applied for leave to appeal from the *Satay Judgment*,

and their application was granted on April 11, 2017.  (*Hare CCIB Decl.* ¶ 29; *Hare PBT Decl.* ¶

33.)  The appeal is pending.

### 4.    *Application for Judicial Review*

On March 10, 2017, the Debtor Banks filed an application for leave to apply for judicial

review (the "*Judicial Review Application*," *Brathwaite CCIB Decl.*, Ex. F) against the Chief

Minister of Anguilla, the Attorney General of Anguilla in his official capacity as a legal representative of the Government of Anguilla, Gary Moving, the receiver of the Parent Banks and ECCB.  The *Judicial Review Application* alleged that as part of the Resolution Plan, in or around April 2016, ECCB and the Receiver agreed to transfer certain of the Parent Banks' liabilities (including their liabilities for deposits up to EC$2.8 million) and an equal amount of assets to NCBA.  (*Id*. ¶¶ 10(2)(i)−(ii).)  At around the same time, the House of Assembly in Anguilla granted the Government of Anguilla money to fund two trusts (the "Trusts") to protect the Parent Banks' large depositors, defined as those depositors whose deposits exceeded EC$4 million.  (*Id*. ¶ 10(2)(iii).)  The intention was to fulfill the policy under which NCBA would assume the Parent Banks' liability to their depositors up to EC$2.8 million while the balance of the deposits would be protected by the Trusts, thereby fully protecting the Parent Banks' depositors.  (*Id*. ¶¶ 11−12.)

The *Judicial Review Application* claimed, in substance, that the respondents unfairly discriminated against the Debtor Banks by guarantying repayment of deposits of all onshore depositors but not of offshore depositors, who are non-residents of Anguilla.  More specifically, the *Judicial Review Application* alleged that based on the upstreaming of the funds, the Debtor Banks were depositors of the Parent Banks (*id*. ¶ 14), and that, accordingly, the Debtor Banks should have received similar protection for their deposits.  Nevertheless, the liability for the Debtor Banks' deposits was not transferred to NCBA, and the Debtor Banks were excluded from eligibility for payments from the Trust.  (*Id*. ¶¶ 15−24.)  As a result, and through the *Judicial Review Application*, the Debtor Banks sought judicial review of various actions and decisions (collectively, the "Decisions") that resulted in this alleged discriminatory treatment (*see id*. 32−34), the cumulative effect of which excluded the Debtor Banks' deposits from the protection

24

up to EC$2.8 million per deposit and eligibility for protection under the Trusts.  (*Id.* ¶ 35.)

Among other things, the Debtor Banks argued that the respondents had discriminated against

similarly situated creditors of the Parent Banks notwithstanding contrary expectations based on

ECCB's promises and assurances to the Debtor Banks that it would protect their deposits.  The

Debtor Banks also claimed that the defendants mistakenly considered the legally irrelevant fact

that the Debtor Banks' depositors were non-Anguillan residents, and that they ignored the fact

that the Debtor Banks, as depositors of the Parent Banks, were domestic depositors."  (*Id.* ¶¶

37−74.)  The Debtor Banks therefore sought (1) a declaration that the Decisions were unlawful,

and orders quashing the Decisions; (2) a declaration that ECCB and the Chief Minister must

effect the transfer of the liability for the Debtor Banks' deposits in the sum of EC$2.8 million per

deposit to NCBA; and (3) a declaration that the Debtor Banks' deposits with the Parent Banks

must receive the same treatment and protections under the Trusts from the Chief Minister and the

Receiver as the Parent Banks' other, similarly situated, depositors.  (*Id.* ¶¶ 87−91.)

The Debtor Banks expressly requested ECCB's consent for a stay of the *Judicial Review

Application* until the final determination of these Adversary Proceedings and the U.S.

Proceedings, but consent was not granted.  (*Fontaine PBT Decl.* ¶ 35; *Fontaine CCIB Decl.* ¶

34.)  On May 25, 2017, the High Court dismissed ECCB's and the Receiver's application for an

adjournment and ordered that they provide reasons for their opposition to a stay of the *Judicial

Review Application*.  (*Fontaine PBT Decl.* ¶ 35; *Fontaine CCIB Decl.* ¶ 34.)  The Attorney

General, representing himself and the Government of Anguilla, did not oppose the stay of the

Judicial Review.  (*Fontaine PBT Decl.* ¶ 35; *Fontaine CCIB Decl.* ¶ 34.)  On June 14, 2017, the

High Court stayed the Judicial Review (*Hare CCIB Decl.*, Ex. E), until the earlier of either a

"final determination" in these Adversary Proceedings or a final settlement agreement between the parties to these Adversary Proceedings.

### D.    The Motions to Dismiss

The Defendants seek to dismiss the Adversary Proceedings on several grounds.  Some of the grounds for dismissal are asserted by all Defendants, while others are asserted independently by some Defendants only.

### 1.    *Dismissal Sought by All Defendants Under Forum Non Conveniens*[13]

Each of the Defendants asserts that these Adversary Proceedings should be dismissed on grounds of *forum non conveniens* because, *inter alia*, the parties are Anguillan entities and Anguilla is the most convenient forum for the Plaintiffs' claims.  The Defendants argue that the Debtor Banks are merely forum shopping by filing their claims in this Court in order to avoid constructive fraudulent transfers under the Bankruptcy Code, a claim not recognized under Anguillan law.  In response, the Plaintiffs argue that dismissal is not warranted given, among other things, that many of the transfers at issue occurred in New York and the Anguillan High Court authorized the Plaintiffs to commence actions in foreign jurisdictions and recently issued a stay on the *Judicial Review Application* pending the outcome of the Adversary Proceedings.  In addition, the Plaintiffs urge denial of the motion to dismiss precisely because Anguillan law does not recognize a claim based on a constructive fraudulent transfer.

### 2.    *Dismissal Sought by ECCB Under the Foreign Sovereign Immunities Act and for Lack of Personal Jurisdiction*[14]

---

[13]    For the Defendants' *Motions to Dismiss*, *see ECCB (PBT) Memo* at 25–31; *NBA Memo* at 11–19*; NCBA (PBT) Memo* at 9–10; *CCB Memo* at 13–22; *ECCB (CCIB) Memo* at 25–31; *NCBA (CCIB) Memo* at 8.  For the Plaintiffs' responses, *see PBT Resp. to ECCB* at 21–32; *PBT Resp. to NBA* at 31; *PBT Resp. to NCBA* at 10; *CCIB Resp. to ECCB* at 24–35; *CCIB Resp. to CCB* at 31; *CCIB Resp. to NCBA* at 9.

[14]    For ECCB's *Motions to Dismiss*, *see ECCB (PBT) Memo* at 19–25; *ECCB (CCIB) Memo* at 13–19.  For the Plaintiffs' responses, *see PBT Resp. to ECCB* at 9–17*; CCIB Resp. to ECCB* at 10–20.

ECCB contends that it is immune from suit in the United States under the Foreign

Sovereign Immunities Act (the "FSIA") because it is a foreign agency or instrumentality and the

commercial activity exception to the FSIA does not apply.  In response, the Plaintiffs allege that

ECCB's activities with respect to the Debtor Banks were nothing more than ordinary banking

commercial activities under the FSIA, which occurred or had a direct effect in the United States

given, among other things, the transfers to and from a United States bank account and the

presence of numerous injured depositors in the United States.

ECCB further asserts that the Court lacks personal jurisdiction over it because the Debtor

Banks have not satisfied their burden to show that ECCB has "minimum contacts" with New

York.  ECCB argues that the Plaintiffs have shown neither general nor specific jurisdiction

because its limited involvement in the transfers to New York do not satisfy the required burden.

In response, the Debtor Banks contend that minimum contacts need not be established once

jurisdiction under the FSIA and proper service have been established, but that, in any event,

ECCB has numerous specific contacts with New York and with the United States generally.

> 3.    *Dismissal Sought by NCBA, NBA and CCB Under International Comity,
> Non-Extraterritoriality of the Provisions of Bankruptcy Code, the Act of
> State Doctrine, and for Failure to State a Claim under Sections 550 and
> 502(d) of the Bankruptcy Code*[15]

NCBA, NBA and CCB alternatively contend that concerns of international comity

warrant staying the Adversary Proceedings pending the outcome of the proceedings in Anguilla.

The Debtor Banks assert that a stay should not be granted because, among other things, the High

---

[15]    For NCBA, NBA and CCB's *Motions to Dismiss, see NBA Memo* at 19–27*; NCBA (PBT) Memo* at 9–10, 14, 18–20, 23–24; *CCB Memo* at 22–29; *NCBA (CCIB) Memo* at 8, 11–13, 16–17.  For the Plaintiffs' responses, *see PBT Resp. to NBA* at 13–32*; PBT Resp. to NCBA* at 5–6, 9–11; *CCIB Resp. to CCB* at 13–22, 27–32; *CCIB Resp. to NCBA* at 5–10.

Court has stayed the *Judicial Review Application* pending the outcome of these Adversary Proceedings.

NCBA, NBA and CCB further argue that the transfers that the Debtor Banks seek to avoid and recover under provisions of the Bankruptcy Code and the New York Debtor Creditor Law (the "NYDCL") are foreign, rather than domestic transfers. Because the avoidance provisions of the Bankruptcy Code and the NYDCL allegedly do not apply extraterritorially, the Plaintiffs cannot seek to avoid the foreign transfers under these provisions.

In response, the Plaintiffs assert that the focus of the Congressional concern, to which a court must look in determining whether application of a statue is extraterritorial, with regards to the avoidance and recovery provisions of the Bankruptcy Code, is on the initial transfers that deplete the bankruptcy estate, and not on the recipient of the transfers. The Plaintiffs thus assert that the focus should be on where the transfers occurred and whether, as here, title transferred in the United States. Since, as the Plaintiffs argue, the transfers are domestic, the Adversary Proceedings should not be dismissed. But the Plaintiffs further contend that should the Court find that the transfers were foreign, Congress has shown a clear intent that the Bankruptcy Code's avoidance powers apply extraterritorially, and that similar public policy reasons favor applying the provisions of the NYDCL extraterritorially. Accordingly, the Plaintiffs contend that the provisions should apply to the contested transfers.

NCBA, NBA and CCB also assert that this Court cannot reach the merits of this case because the act of state doctrine precludes the Court from adjudicating a case based on allegations that a foreign banking regulator (*i.e.*, ECCB) violated its own laws in its own territory. The Plaintiffs, on the other hand, contend that the challenged actions occurred in the United States and are commercial in nature, and are not subject to the act of state defense.

28

NBA, CCB and NCBA further contend that the Plaintiffs' claims under section 550 of the

Bankruptcy Code fail because there is no viable avoidance claim in these cases as a basis for

recovery under that section, and the disallowance claim under section 502(d) is premature

because they have not filed claims that could be disallowed.

In response, the Debtor Banks argue that their section 550 claims are proper because they

have stated legally sufficient avoidance claims, and the section 502(d) claim is not premature

because the bar date for filing claims has not passed.  Indeed, it has not even been set.

> 4.    *Dismissal Sought by NCBA for Failure to State Claims for Relief Under
> Sections 548 and 544 of the Bankruptcy Code[16]*

NCBA contends that the Plaintiffs fail to state claims for relief under sections 548 and

544 of the Bankruptcy Code and the NYDCL because (i) the Plaintiffs fail to allege with

sufficient detail pre-petition transfers from the parent defendant (*i.e.*, NBA and CCB,

respectively) to NCBA on April 22, 2016, including their amount, and the specific funds and

assets at issue; and (ii) the Plaintiffs' allege that they retained their equitable interests in the

Funds both before and after the alleged transfers, and hence, fail to allege a transfer of an interest

in their property.  The Plaintiffs counter that they have pled the requisite details for the

fraudulent transfer claims, and given the broad definition of "transfer," a transfer of the Debtor

Banks' legal title in the Funds occurred when the funds were deposited into the Parent Banks'

BofA accounts.

Because we conclude that these Adversary Proceedings should be stayed based on *forum
non conveniens* and international comity, we decline to decide any other issues raised by the

*Motions to Dismiss.  See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422,

---

[16]    For NCBA's *Motions to Dismiss, see NCBA (PBT) Memo* at 10–18; *NCBA (CCIB) Memo* at 8–13.  For the Plaintiffs' responses, *see, PBT Resp. to NCBA* at 6–8*; CCIB Resp. to NCBA* at 6–8.

425 (2007) (concluding that a court may dismiss an action based on *forum non conveniens* without first deciding other threshold objections such as subject matter jurisdiction or personal jurisdiction).  If these cases return here after decisions by the courts in Anguilla, those remaining arguments can be dealt with then.

### III.    DISCUSSION

### B.    These Cases Should Be Stayed Based on *Forum Non Conveniens*

All of the Defendants in these Adversary Proceedings move to dismiss or stay these cases based on *forum non conveniens*.  The Plaintiffs and all of the Defendants are citizens of or domiciled in Anguilla.  There is litigation pending in the courts of Anguilla between all of these parties, and, indeed, the Anguilla Initial Proceedings and the Satay Action were pending before these Adversary Proceedings were filed in New York.  No one disputes that the Anguilla High Court has personal and subject matter jurisdiction over the parties.  One might be inclined to ask the obvious question—why did the Plaintiffs file these cases here if all of the foregoing is true? The obvious answer is that the Plaintiffs believe that certain causes of action can be asserted here that cannot be asserted in Anguilla—specifically, the constructive fraudulent transfer claims under federal and New York law that, according to the Plaintiffs, have no counterpart and cannot be asserted under Anguilla law.  The Plaintiffs' counsel nevertheless acknowledged that the *remedy* that the Plaintiffs seek in these cases is available through their breach of fiduciary duty and actual fraudulent transfer causes of action, already pending in Anguilla.  (Tr. at 107:14–24.) Assuming that the Plaintiffs' *Complaints* have properly stated causes of action for constructive fraudulent transfers (or, could be amended to do so), does that require that the *forum non conveniens* motions should be denied?  The Court concludes below that the availability here of causes of action that are not available in Anguilla does not require denial of the *Motions to*

30

*Dismiss*, but that a stay of these Adversary Proceedings rather than dismissal is appropriate.

Depending on the disposition of the cases in Anguilla, it may be appropriate for the Plaintiffs to

return to this Court to seek resolution of any of the claims in the *Complaints* that are not resolved

by the Anguilla courts, are not precluded by recognition and enforcement of judgments in

Anguilla, and are not subject to dismissal for the additional reasons urged by the Defendants in

the *Motions to Dismiss* before the Court.

### 1.    Legal Principles of Forum Non Conveniens

The doctrine of *forum non conveniens* "is a discretionary device permitting a court in rare

instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over

the claim." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (internal

citation and quotation marks omitted). Whether to dismiss an action on *forum non conveniens*

grounds is a decision that "'lies wholly within the broad discretion of the [] court' and should be

reversed only if 'that discretion has been clearly abused.'" *Peregrine Myanmar Ltd. v. Segal*, 89

F.3d 41, 46 (2d Cir. 1996) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81

F.3d 1224, 1232 (2d Cir. 1996)). A court may dismiss an action under *forum non conveniens*

"when considerations of convenience, fairness, and judicial economy so warrant." *Magi XXI,*

*Inc. v. Sato della Citta del Vaticano*, 714 F.3d 714, 720 n.6 (2d Cir. 2013) (citation omitted).

In the Second Circuit, courts apply a three-step process to determine whether to dismiss

an action for *forum non conveniens. Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d

Cir. 2001). First, the court must "determine[] the degree of deference properly accorded [to] the

plaintiff's choice of forum." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d

Cir. 2005) (citing *Iragorri*, 274 F.3d at 73). Second, "after determining whether the plaintiff's

choice is entitled to more or less deference," the court must determine "whether an adequate

alternative forum exists." *Iragorri*, 274 F.3d at 73.  Third, the court must "then balance a series

of factors involving the private interests of the parties in maintaining the litigation in the

competing fora and any public interests at stake." *Wiwa*, 226 F.3d at 100 (citing *Gulf Oil Corp.

v. Gilbert*, 330 U.S. 501, 508–09 (1947)).  "In considering these factors, the court is necessarily

engaged in a comparison between the hardships defendant would suffer through the retention of

jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the

obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74.  The law presumes that the

plaintiff's choice of forum is adequate, and the defense must overcome a "heavy burden" to have

the case dismissed on *forum non conveniens* grounds.  *Sinochem*, 549 U.S. at 430; *Wiwa*, 226

F.3d at 100; *see also Gilbert*, 330 U.S. at 508 (stating that "unless the balance [of the factors] is

strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed");

*Iragorri*, 274 F.3d at 74–75 (explaining that "[a] defendant does not carry the day simply by

showing the existence of an adequate alternative forum.  The action should be dismissed only if

the chosen forum is shown to be genuinely inconvenient and the selected forum significantly

preferable").  For the reasons discussed below, the Court concludes that the factors cited by the

*Iragorri* court strongly favor staying these Adversary Proceedings on grounds of *forum non

conveniens*.

### 2.    *Degree of Deference to the Plaintiff's Choice of Forum*

Courts measure the degree of deference owed to a plaintiff's choice of forum on a sliding

scale; the more it appears that the plaintiff's choice of a United States forum was motivated by

forum shopping reasons, the less deference the plaintiff's choice commands, *see In re

Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d

488, 498 (2d Cir. 2002); *Iragorri*, 274 F.3d at 71, because "it 'is much less reasonable' to

presume that the choice was made for convenience." *Iragorri*, 274 F.3d at 71 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)); *see also Monegasque De Reassurances*, 311 F.3d at 498 (holding that "[a] domestic petitioner's choice of its home forum receives great deference, while a foreign petitioner's choice of a United States forum receives less deference"). "In such circumstances, a plausible likelihood exists that the selection was made for forum-shopping reasons . . . ." *Iragorri*, 274 F.3d at 71. Even if forum shopping reasons did not inform the foreign plaintiff's decision to file an action in a U.S. court, "there is nonetheless little reason to assume that it is convenient for a foreign plaintiff." *Id.*

In determining the degree of deference to be afforded to a foreign plaintiff's choice of a United States forum, courts consider various factors to ascertain whether the plaintiff's forum choice was motivated by convenience or instead by the desire to forum shop. *See Norex*, 416 F.3d at 155 (citing *Iragorri*, 274 F.3d at 72). These include "[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of witnesses or evidence to the forum district, [3] the defendant's amenability to suit in the forum district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to convenience or expense." *Iragorri*, 274 F.3d at 72. Circumstances indicative of forum shopping include "[1] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [2] the habitual generosity of juries in the United States or in the forum district, [3] the plaintiff's popularity or the defendant's unpopularity in the region, or [4] the inconvenience and expense to the defendant resulting from litigation in that forum. . . ." *Id.*

Here, the Plaintiffs' choice of forum was not motivated by convenience. The Debtor Banks were incorporated in Anguilla, do not operate in the United States (other than having accepted U.S. dollar deposits that were deposited in the Parent Banks' New York bank

accounts), and their Administrator, Mr. Tacon resides in England. (*Tacon PBT Decl.* ¶ 4.) The Conservator Directors, the key witnesses in these cases, reside in Anguilla, the Eastern Caribbean or London, (Tr. at 56:12–20), and aside from banking documents in New York, access to which does not appear to present any difficulties even if the suits were pursued in Anguilla, all of the evidence and witnesses for these cases are located in the Eastern Caribbean or elsewhere, but not in the United States. Finally, the Defendants are amenable to suit in Anguilla—the Plaintiffs had already sued the Defendants in Anguilla as part of the Anguilla Initial Proceedings before they commenced these Adversary Proceedings, and the all parties are represented by legal counsel there.

Instead, the choice of a New York venue was an exercise in forum shopping. Despite the Plaintiffs' arguments that this forum is convenient and their lawsuits have New York connections, they initially sued these same defendants in Anguilla to impress a trust, and ultimately, recover the same Funds. The Plaintiffs commenced the Adversary Proceedings only after the Anguillan High Court issued the *Leave Order*, stymying their efforts to recover on substantially similar claims. The High Court refused to lift the stay to allow the Plaintiffs to proceed against the Parent Banks based on the Plaintiffs' failure to join the Conservator Directors, and the Plaintiffs then commenced these Adversary Proceedings in this venue rather than join the Conservator Directors in the Anguilla Initial Proceedings. Even giving the Plaintiffs the benefit of the doubt, they freely admit that they are pursuing these Adversary Proceedings because "Anguillan law does not recognize certain claims for which recovery is sought." (*PBT Resp. to ECCB* at 26.) Accordingly, the Plaintiffs' selection of New York as a forum is not entitled to any deference.

The Plaintiffs' *Opposition* authority is distinguishable. In *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 267 (S.D.N.Y. 2012), *aff'd*, 522 F. App'x 88 (2d Cir. 2013) (summary order), the plaintiff, a Nigerian company, agreed to buy oil from the defendants, state-owned Venezuelan entities. Their agreement provided that all payments would be made in U.S. dollars to the seller's agent's bank account in New York. *Id.* After the plaintiff made the payments but did not receive the oil, it sued in New York federal court for a refund. *Id.* at 267–68. The defendants moved to dismiss, *inter alia*, based on *forum non conveniens*. The district court concluded that the plaintiff's choice of forum was entitled to considerable (but not maximum) deference. *Id.* at 273. The transaction had a *bona fide* connection to New York based on the transfer of millions of dollars to a New York bank account where it "disappeared down the rabbit hole in New York, and Skanga wishes to follow it." In addition, the plaintiff would likely have to seek discovery from the seller's New York banks and its United States operations. *Id.*

In these Adversary Proceedings, while the *Complaints* refer to transactions between the Debtor Banks and the Defendants that have connections to New York and the United States, these connections do not overcome the Court's conclusion that the Plaintiffs' choice of a New York forum is not entitled to deference. At bottom, the New York venue was the Plaintiffs' second choice, not their first, and unlike in *Skanga*, the Plaintiffs were already seeking the same relief for the same wrongs in the foreign forum. In addition, and as discussed below, the Plaintiffs' detailed pleadings indicate that they know the path taken by the Funds, and the relevant evidence is primarily located in Anguilla, not New York.

### 3.    *Existence of an Adequate Alternative Forum*

"An alternative forum is ordinarily adequate if (1) the defendants are amenable to service

of process there and (2) the forum permits litigation of the subject matter of the dispute."

*Monegasque De Reassurances*, 311 F.3d at 499 (citation omitted).  "[T]he availability of an

adequate alternative forum does not depend on the existence of the identical cause of action in

the other forum."  *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d

603, 610 (2d Cir. 1998).  Furthermore, the fact that the law of the alternative forum is less

favorable does not weigh against dismissal.  *Piper*, 454 U.S. at 255 n.22; *Cortec Corp. v. Erste

Bank Ber Oesterreichischen Sparkassen AG (In re Erste Bank)*, 535 F. Supp. 2d 403, 411–12

(S.D.N.Y. 2008) (holding that Croatian commercial law controlled and that plaintiffs' concerns

that Croatia did not recognize tortious interference with business claims did not render Croatia an

inadequate alternative forum); *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 255–56

(S.D.N.Y. 2007) (finding Cyprus to be an adequate alternate forum although claims for aiding

and abetting a breach of fiduciary duty and breach of implied duty of good faith and fair dealing

are not recognized by Cypriot courts); *Fustok v. Banque Populaire Suisse*, 546 F. Supp. 506, 514

(S.D.N.Y. 1982) ("Apart from precedent, there is a strong policy reason for rejecting plaintiff's

argument that *forum non conveniens* does not apply whenever a plaintiff alleges a federal cause

of action.  If such were the rule, a plaintiff, by the simple device of alleging even a colorable

federal claim, could effectively prevent consideration by the court of a *forum non conveniens*

dismissal no matter how inconvenient plaintiff's chosen forum and regardless of how

burdensome such litigation would be upon our courts and citizens.  Such a *per se* rule would

conflict with the hallmarks of the *forum non conveniens* doctrine—namely, its flexibility and the

wide discretion which it invests in the trial judge").  To be inadequate, the *remedy* offered must

be clearly unsatisfactory, such as where the alternative forum does not permit litigation of the subject matter of the dispute.  *Piper*, 454 U.S at 255 n.22.

Here, Anguilla is an adequate alternate forum.  First, the parties do not contest, and this Court has previously found, that the Anguillan courts are competent to adjudicate disputes.  *See In re HBLS, L.P.,* 468 B.R. 634, 640 (Bankr. S.D.N.Y. 2012) (explaining that "the courts of Anguilla are available and competent to adjudicate these issues.  There is no need for this Court to inject itself into proceedings that have already been or can be handled in Anguilla").  Further, the Plaintiffs initially sued the Parent Banks and NCBA in Anguilla in connection with the subject matter of this dispute, and cannot, therefore, contend that the Anguillan forum is inadequate.  *Saud v. PIA Invs. Ltd.*, No. 07 Civ. 5603(NRB), 2007 WL 4457441, at *3 (S.D.N.Y. Dec. 14, 2007) ("Having already commenced a lawsuit against PIA regarding the same subject matter in the High Court of Justice of the British Virgin Islands . . .  plaintiff cannot suggest that the British Virgin Islands courts lack general competency")  While it is true that ECCB had not been sued by the Plaintiffs in Anguilla before the filing of the PBT Adversary Proceeding on December 16, 2016, the Plaintiffs sought leave to do so on March 10, 2017 by filing the *Judicial Review Application* in Anguilla.  By the time the CCIB Adversary Proceeding was filed on May 1, 2017, the Plaintiffs had brought suit against all of the Defendants in Anguilla, and thus, can hardly contend that the Anguillan forum is inadequate.

Second, although Anguillan law does not recognize a claim to avoid and recover a *constructive* fraudulent transfer, this does not render the Anguillan forum inadequate.  *Piper*, 454 U.S. at 247 (explaining that "[t]he Court of Appeals erred in holding that plaintiffs may defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of

the present forum.  The possibility of a change in substantive law should ordinarily not be given

conclusive or even substantial weight in the *forum non conveniens* inquiry.")  Moreover, the

Anguillan Fraudulent Dispositions Act does provide a remedy to avoid and recover intentional

fraudulent transfers,[17] and the Plaintiffs can prove their cases, they will be able to recover the

same *remedy* as if they proceeded under the Bankruptcy Code.

Third, other causes of action asserted by the Plaintiffs in the Anguillan Initial

Proceedings also provide the same remedy that the Plaintiffs are seeking in this Court—the

recovery of the upstreamed funds and transferred property.  While the Plaintiffs have not

asserted in Anguilla, as they have in these Adversary Proceedings, that ECCB breached its

fiduciary duties to the Debtor Banks, was grossly negligent and aided and abetted the

Conservator Directors' breach of fiduciary duties, these claims will presumably be governed by

Anguillan law and can be asserted in Anguilla.[18]  Therefore, Anguilla is an adequate alternate

forum for the litigation of the subject matter of the dispute.

4.    *The Balancing of Public and Private Factors*

In determining whether the doctrine of *forum non conveniens* should be applied, a court

should also consider "factors of public interest" and the "private interest[s] of the litigant."

*Gilbert*, 330 U.S. at 508.  A balancing of the "private and public interest factors [must] tilt[]

---

[17]    A copy of the Fraudulent Dispositions Act is annexed as part of Exhibit A to the *Hare CCIB Declaration*.
By its terms, it applies extraterritorially to "every disposition of property . . . whether or not the property, the subject
of the disposition, is situated in Anguilla or elsewhere."  (Fraudulent Dispositions Act § 2.)  Thus, it would reach
transfers of property within New York.

[18]    The Plaintiffs' splitting of their causes of action between the Anguillan High Court and this Court is
perplexing.  They did not assert fraudulent transfer claims in Anguilla, but asserted fraudulent transfer claims based
on Anguilla's Fraudulent Dispositions Act in this Court.  (*See* ¶¶ 173–99; *PBT Compl.* ¶¶ 189–216.)  In addition, the
Plaintiffs did not assert a claim that ECCB had breached its fiduciary duties to the Debtor Banks in any of the
Anguillan proceedings, but asserted those claims as well as gross negligence and aiding and abetting breach of
fiduciary duty claims in this Court, (*see* ¶¶ 244–70; *PBT Compl.* ¶¶ 262–85), despite the fact that these claims will
likely be determined under Anguillan law, including under the ECCB Act.

heavily in favor of the alternative forum." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir.

2009); *see also Alfadda v. Fenn*, 159 F.3d 41, 45–46 (2d Cir. 1998).  Here, they do.

> a.    The Private Factors

In weighing the litigants' private interests, a court should consider

> [1] the relative ease of access to sources of proof; [2] availability
> of compulsory process for attendance of unwilling, and the cost of
> obtaining attendance of willing, witnesses; [3] possibility of view
> of the premises, if view would be appropriate to the action; and [4]
> all other practical problems that make trial of a case easy,
> expeditious and inexpensive.

*Gilbert,* 330 U.S. at 508; *accord Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974,

980 (2d Cir. 1993); *Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecommunications*

*(Luxembourg) II SCA)*, 555 B.R. 323, 348 (Bankr. S.D.N.Y. 2016) ("Hellas II") (citations

omitted).

As previously noted, the majority of the relevant evidence is located or accessible in

Anguilla but not in New York.  Difficulties in obtaining documents and witness testimony

support dismissal or a stay of litigation in favor of the more convenient foreign forum.  *See*

*FUNB v. Arab African Int'l Bank*, 48 F. App'x. 801, 805 (2d Cir. 2002) (summary order)

(dismissing a suit by an American bank against Middle Eastern banks because most of the

documents were in London, many witnesses could not be compelled to testify in New York, and

the general cost of litigation was lower in London); *see also Florian v. Danaher Corp.*, 69 F.

App'x. 473, 475 (2d Cir. 2003) (summary order) (finding that the district court did not abuse its

discretion by dismissing a products liability action on *forum non conveniens* grounds when

virtually every fact witness was located in Canada, where the accident occurred).  Here, none of

the witnesses, in particular, the Conservator Directors, are located in the United States or within

this Court's subpoena power.  Moreover, the records of the Debtor Banks, the Parent Banks,

NCBA and ECCB are presumably located in Anguilla, but are certainly not located here.  The

only relevant records within this jurisdiction are the various bank records that are necessary to

establish the transfers and depict the flow of funds.  However, the Plaintiffs already have this

information, judging from the schedules attached to the *Complaints*, and access to this proof for

use in Anguilla does not appear to present a problem.[19]  *See Seidel v. Ritter* (*In re Kinbrace

Corp.*), Adv. Pro. No. 15–01432 (SMB), 2017 WL 1380524, at \*6 (Bankr. S.D.N.Y. Apr. 17,

2017).

      Conversely, while the testimony of the Conservator Directors and of ECCB is crucial to

these Adversary Proceedings it would be difficult, if not impossible, to procure their attendance

in this Court.  This litigation is not simply a "document" case where the Plaintiffs will establish

their *prima facie* case through the introduction of business records.  The Plaintiffs assert that

ECCB breached its fiduciary duties to the Debtor Banks, was grossly negligent and aided and

abetted the Conservator Directors' breach of their own fiduciary duties to the Debtor Banks.  (¶¶

244–270; *PBT Compl.* ¶¶ 262–85.)  In addition, the Anguillan High Court has ruled that the

Defendants may be entitled to immunity if the Conservator Directors acted in good faith and

without negligence.  Furthermore, the Conservator Directors' business judgment may be an issue

in connection with the actions they took on behalf of the Parent Banks as the sole shareholders of

the Debtor Banks and as their servicers under the PBT Service Agreement and the CCIB

Agreement for Service.  All of the Conservator Directors and ECCB's actions took place in

---

[19]    At oral argument, the Court questioned the Plaintiffs' counsel regarding the failure to allege the intentional
fraudulent transfers with the specificity (*e.g.*, date, amount, identity of the transferee) required by Rule 9(b) of the
Federal Rules of Civil Procedure.  Counsel for the Plaintiffs responded that the Defendants have the records and
"should be able to figure it out," but if need be, the Plaintiffs "would be, of course, more than happy to [amend the
pleadings] and set forth all of the transfers that comprised those amounts."  (Tr. at 119:6–17.)  It therefore appears
that all parties already have the records relating to the transfers.

Anguilla or the Eastern Caribbean, and their availability, the ability to compel their attendance

and the relative ease and access to proof weigh heavily in favor of the Anguillan forum.

> b.    *The Public Factors*

In *Gilbert*, the court identified several public interest factors that a court should consider

when faced with a motion to dismiss based on *forum non conveniens.*  These include (1)

administrative difficulties relating to court congestion; (2) imposing jury duty on citizens of the

forum; (3) having local disputes settled locally; and (4) avoiding problems associated with the

application of foreign law.  330 U.S. at 508–09; *accord Hellas II*, 555 B.R. at 348 ("The public

interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of

applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that

have no impact on their community") (citation omitted).   "Numerous courts have found that the

public interest factors often favor dismissal where there is a parallel litigation arising out of the

same or similar facts already pending in the foreign jurisdiction." *Argus Media Ltd. v. Tradition*

*Fin. Servs. Inc.*, No. 09 Civ. 7966 (HB), 2009 WL 5125113, at *6 (S.D.N.Y. Dec. 29, 2009)

(citing cases).  In addition, "deferring to litigation in another jurisdiction is appropriate where the

litigation is 'intimately involved with sovereign prerogative' and it is important to ascertain the

meaning of another jurisdiction's statute 'from the only tribunal empowered to speak

definitively.'"  *Figueiredo Ferraz Engenharia de Projeto Ltda. v. Republic of Peru,* 665 F.3d

384, 392 (2d Cir. 2011) (quoting *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S.

25, 28–29 (1959)).

Here, the private factors weigh in favor of dismissal.  Parallel litigations are already

pending in Anguilla, although the Anguilla Initial Proceedings is currently stayed against the

Parent Banks.  The Plaintiffs have appealed from the *Leave Order*, but it seems that they can

avoid the stay simply by joining the Conservator Directors.  In addition, these Adversary

Proceedings arise from the bailout of two Anguillan banks authorized, and according to the

*Complaints*, directed and controlled by ECCB, an arm of the Anguillan State.  The legality of the

actions taken by the Conservator Directors, including the upstreaming of customer deposits and

the transfer of other property owned by the Debtor Banks to the Parent Banks, and ultimately, to

NCBA and possibly ECCB, must be determined in accordance with the ECCB Act and

applicable Anguillan law.  Although "the need to apply foreign law . . . alone is not sufficient to

warrant dismissal," *Piper*, 454 U.S. at 260 n.29; *see also Boosey & Hawkes Music Publishers,*

*Ltd. v. Walt Disney Co.,* 145 F.3d 481, 492 (2d Cir.1998) ("While reluctance to apply foreign

law is a valid factor favoring dismissal under *Gilbert,* standing alone it does not justify

dismissal."), it may nevertheless be considered as part of the balancing equation.  *See*

*Monegasque de Reassurances S.A.M. v. NAK NAFTOGAZ OF UKRAINE and State of Ukraine,*

158 F. Supp. 2d 377, 387 (S.D.N.Y. 2001) ("Courts have a legitimate interest in avoiding the

difficulty with questions of conflicts of law and the application of foreign law."), *aff'd,* 311 F.3d

488 (2d Cir. 2002).

In fact, the High Court has already addressed the Defendants' claims of immunity under

Anguillan law.  The *Satay* court held that the Conservator Directors had acted *ultra vires*, and

were not entitled to statutory immunity under Article 50 of the ECCB Act.  In addition, the

applicability of Article 5F immunity presented a question of fact.  The *Satay Judgment* is on

appeal.  Furthermore, the *Satay* court did not address the Conservator Directors' right to take the

challenged actions in their capacities as directors of the Parent Banks, sole shareholders of the

Debtor Banks, an issue that must also be decided under Anguillan law, as is the Conservator

Directors' authority under the service agreements between the Debtor Banks and the Parent

Banks.

The Anguillan High Court also addressed Article 5F in the *Leave Order*.  It ruled that the

*Debtor Banks' Statement of Claim* failed to allege lack of immunity under that provision because

the pleading did not assert that the Conservator Directors had acted negligently and in bad faith.

The *Leave Order* also concluded that it could not determine whether immunity under Article

50(7)(i) applied without further briefing from the parties because it could not determine that "the

reliefs being sought fall outside that section on the basis that it constitutes a civil right."  In

contrast, the *Satay* Court had ruled that the Article 50 immunities raised in that case did not

apply because the Conservators had acted *ultra vires*.  The Debtor Banks have appealed from the

*Leave Order*.

The issue of the Conservator Directors' and the Defendants' immunity from suit has been

a focal point of litigation in the Anguillan proceedings, the Anguillan decisions appear to be

somewhat inconsistent, and the immunity issues are on appeal in Anguilla.  Moreover,

substantial resources have already been expended in Anguilla to litigate these issues, and the

outcome of these Adversary Proceedings will depend on the overriding question of whether

ECCB, Anguilla's central bank and a sovereign entity, appropriately executed a bank rescue plan

(*i.e.*, the Resolution Plan) under Anguillan law for the purpose of preserving the Anguillan

banking system.  Only the Anguillan courts are authorized to speak definitively on these issues,

and deference to those proceedings is appropriate.

It is true that the United States has certain connections to the Anguillan rescue plan.  As

alleged in the *Complaints*, the Conservator Directors "upstreamed" the Debtor Banks' funds to

the Parent Banks in New York, although the Debtor Banks' counsel indicated during oral

argument that the "upstreamed" funds were never in accounts maintained by the Debtor Banks.[20]
But even if all of the transfers were domestic, the legality of the transfers and the extent of the
Defendants' liability in the face of their assertions of immunity turn on interpretations of
Anguillan law.  Anguilla, therefore, has an overwhelming and stronger interest in determining
the legality of those actions and the extent of the Defendants' liability.

Finally, the Plaintiffs have demanded a jury trial.  When a court has very little interest in
adjudicating the claims primarily due to the removed location of events and the applicability of
foreign law, this could create an unnecessary burden on jurors.  *Stewart v. Adidas A.G.*, 1997 WL
218431, at *7 (S.D.N.Y. Apr. 30, 1997).

While the most common disposition where a *forum non conveniens* motion is granted is
dismissal of the case, a stay rather than dismissal may be more appropriate when the case may
return to this Court following decisions of the foreign courts.  *See Hellas II*, 555 B.R. 330.  The
international comity analysis in the next section also clearly supports a stay rather than dismissal
under the circumstances of this case.

### C.    These Cases Should Be Stayed Based on International Comity Pending the Outcome of the Anguilla Litigation

The doctrines of *forum non conveniens* and international comity are animated by many of
the same concerns, and are often raised together in motions to stay or dismiss.  As already
explained above, the Court concludes that *forum non conveniens* supports staying both of these
Adversary Proceedings in favor of the courts in Anguilla.  And as explained in this section,
application of international comity leads to the same result.

---

[20]    As noted, the *CCIB Complaint* also alleges that the Morgan Stanley transfer from CCIB to CCB was
domestic, but CCIB does not appear to seek to avoid and recover that transfer through its avoidance claims.

Even if the Court has jurisdiction over all the parties in these cases—an issue not fully resolved at this point—the Court may choose not to exercise that jurisdiction based on international comity principles.  NBA and CCB are the only defendants in these Adversary Proceedings that moved to stay based on international comity in favor of the Anguilla Initial Proceedings, the Satay Action, and the Judicial Review.  But international comity principles are well established and may be applied here to all of the parties before the Court.  Deference to pending foreign proceedings and this Court's customary obligation to exercise jurisdiction in cases otherwise properly within its jurisdiction must be balanced.  Therefore, the Court must decide whether international comity favors deferring, at least in the first instance, to the PBT and CCIB foreign main proceedings and to the Anguilla Litigation.

The question is particularly acute here because of the circumstances revolving around these Adversary Proceedings.  CCIB and PBT were placed into administration in Anguilla, the same Foreign Representative was appointed in each of the Anguilla Administrations, and after the Foreign Representative filed the chapter 15 cases in this Court, the two Anguilla Administrations were recognized as foreign main proceedings.  The Foreign Representative then filed chapter 11 cases for both CCIB and PBT, followed by the filing of the two Adversary Proceedings that are the subject of the pending Motions.  The Anguilla Litigation involves the same parties as these Adversary Proceedings, and the causes of action in the Adversary Proceedings and the Anguilla Initial Proceedings and the Satay Action arise from the same facts. The Anguilla Initial Proceedings and the Satay Action were filed months before the Adversary Proceedings in this Court, and the Anguilla courts have personal and subject matter jurisdiction over all of the parties.  For the reasons explained below, the Court concludes that international comity principles warrant a stay of these Adversary Proceedings pending the outcome of the

Anguilla Litigation.  Under the present circumstances, staying these cases—rather than

dismissing them—is appropriate to preserve the Plaintiffs' domestic causes of action while

granting proper deference to proceedings in the Anguilla courts.  Depending on the disposition of

the Anguilla Litigation, it may be appropriate for the Plaintiffs to return to this Court to seek

resolution of any claims in the Adversary Proceedings that are not resolved by the Anguilla

courts and are not precluded by recognition and enforcement of judgments entered in Anguilla.

### 1.    International Comity Considerations

"Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand,

nor a mere courtesy and good will, upon the other.  But it is the recognition which one nation

allows within its territory to the legislative, executive or judicial acts of another nation, having

due regard both to international duty and convenience, and to the rights of its own citizens or of

other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 163–64

(1895).  The boundaries of the international comity doctrine have been described as

"amorphous" and "fuzzy."  *See JP Morgan Chase Bank v. Altos Hornos de Mexico*, 412 F.3d

418, 423 (2d Cir. 2005) (citation omitted); *see also Official Comm. of Unsecured Creditors v.*

*Bahrain Islamic Bank (In re Arcapita Bank B.S.C.(C))*, 575 B.R. 229, 237 (Bankr. S.D.N.Y.

2017).

Second Circuit courts as well as the Supreme Court have taken great care to analyze and

clarify the international comity doctrine, as well as its underlying rationale.  As the Supreme

Court has noted, the international comity doctrine "is not just a vague political concern favoring

international cooperation when it is in our interest to do so [but r]ather it is a principle under

which judicial decisions reflect the systematic value of reciprocal tolerance and goodwill."

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court of S. Dist. of Iowa*, 482 U.S. 522,

555 (1987).  Comity "refers to the spirit of cooperation in which a domestic tribunal approaches

the resolution of cases touching the laws and interests of other sovereign states." *Gucci America,*

*Inc. v. Weixing Li*, 768 F.3d 122, 139 (2d Cir. 2014) (quoting *Société Nationale Industrielle*

*Aérospatiale*, 482 U.S. at 543 n.27).

While a defendant's international comity defense should be assessed from the "legal

sense," a court must not lose sight of the broader principles underlying the doctrine.  *See Altos*

*Hornos*, 412 F.3d at 423 ("Whatever its precise contours, international comity is clearly

concerned with maintaining amicable working relationships between nations, a 'shorthand for

good neighborliness, a common courtesy and mutual respect between those who labour in

adjoining judicial vineyards.'") (citation omitted)).  On the other hand, even where the comity

doctrine clearly applies, it "is not an imperative obligation of courts, but rather is a discretionary

rule of 'practice, convenience, and expediency.'"  *Royal and Sun Alliance Ins. Co. of Canada v.*

*Century Int'l Arms*, 466 F.3d 88, 92 (2d Cir. 2006) (citation and quotation marks omitted); *see*

*also Duff & Phelps, LLC v. Vitro S.A.B. de C.V.*, 18 F. Supp. 3d 375, 382 (S.D.N.Y. 2014)

(explaining that "[t]he decision to grant comity is a matter within a court's discretion and the

burden of proof to establish its appropriateness is on the moving party") (citations omitted).

The Second Circuit has explained that international comity "may describe two distinct

doctrines . . . ."  *Maxwell Comm'n Corp. v. Societe Generale (In re Maxwell Comm'n Corp.)*, 93

F.3d 1036, 1047 (2d Cir. 1996) ("Maxwell II").  The first doctrine—often referred to as

legislative or prescriptive comity, or comity among nations—is "a canon of construction" which

serves to "shorten the reach of a statute."  *Arcapita Bank*, 575 B.R. at 238 (citing *Maxwell II*, 93

F.3d at 1047; *Mujica v. Airscan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) (explaining that

"legislative or 'prescriptive comity' . . . guides domestic courts as they decide the extraterritorial

47

reach of federal statutes.")).  "Under international comity, states normally refrain from

prescribing laws that govern activities connected with another state when the exercise of such

jurisdiction is unreasonable."  *Arcapita Bank*, 575 B.R. at 237 (citations and quotation marks

omitted); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 2016

WL 6900689, at *12 (Bankr. S.D.N.Y. Nov. 21, 2016) (clarifying that "comity among nations

[is] a canon of construction that limits the reach of the Bankruptcy Code's avoidance and

recovery provisions") (citation omitted).  It is unclear in these cases whether prescriptive comity

should apply.  On the one hand, to the extent that wholly domestic transfers are involved, federal

and New York avoidance statutes express strong public policies protecting creditors from actual

or constructive avoidable transfers.  On the other hand, the alleged transfers were made

exclusively between Anguillan financial institutions that were regulated by Anguillan authorities

in Anguilla, which has a strong interest in regulating those institutions.  If these two regulatory

regimes clash, which one should give way?  As explained below, this Court need not resolve that

conflict at this time.

The second doctrine—referred to as adjudicative comity, or comity among courts—is "a

discretionary act of deference by a national court to decline to exercise jurisdiction in a case

properly adjudicated in a foreign state."  *Arcapita Bank*, 575 B.R. at 238 (citing *Maxwell II*, 93

F.3d at 1047; *Mujica*, 771 F.3d at 599 (stating that "adjudicatory comity involves . . . the

discretion of a national court to decline to exercise jurisdiction over a case before it when that

case is pending in a foreign court with proper jurisdiction.") (citation and quotation marks

omitted)); *see also Altos Hornos*, 412 F.3d at 424 (finding, where the dispute involved the

ownership of property a debtor claimed as part of its estate in a foreign bankruptcy proceeding,

that "[i]nternational comity, as it relates to this case, involves not the choice of law but rather the

48

discretion of a national court to decline to exercise jurisdiction over a case before it when that

case is pending in a foreign court with proper jurisdiction") (citation omitted).

Because the Court concludes that comity among courts supports a stay of these

Adversary Proceedings, it is unnecessary to reach the issue whether prescriptive comity supports

narrowing the reach of federal and New York State avoidance statutes.[21]   NBA and CCB argue

that comity principles favor the recognition of the pending Anguilla Litigation that have yet to

reach final judgment, and that proper deference to these proceedings requires abstention by

United States courts.   The claims in the Adversary Proceedings fall squarely within

considerations of comity among courts.   *See Royal and Sun Alliance*, 466 F.3d at 92.

Applying international comity among courts, courts "ha[ve] the inherent power to dismiss

or stay an action based on the pendency of a related proceeding in a foreign jurisdiction."   *Ole

Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 WL 2531277, at *2 (S.D.N.Y. June 10, 2013)

(collecting cases).   This reflects "the proper respect for litigation in and the court of a sovereign

nation, fairness to litigants, and judicial efficiency."   *Royal and Sun Alliance*, 466 F.3d at 94

(collecting cases).   Nonetheless, concerns of comity must be balanced against the "virtually

unflagging obligation of the federal courts to exercise the jurisdiction given to them."   *Colorado

River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976).   In evaluating whether to

defer to a foreign proceeding, "[t]he task of a [bankruptcy] court . . . is not to articulate a

justification *for* the exercise of jurisdiction, but rather to determine whether exceptional

circumstances exist that justify the surrender of that jurisdiction."   *Royal and Sun Alliance*, 466

---

[21]       Although it is unclear from the current version of the *Complaints*, it appears that some or all of the
challenged transfers may have occurred entirely between accounts in the United States.  If these cases return to this
Court after decisions of the courts in Anguilla, the Plaintiffs will need to amend the *Complaints* to more clearly
allege the facts showing the transfers at issue—the who, what, where and when for each transfer.

F.3d at 93 (emphasis in original) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983); *Colorado River*, 424 U.S. at 813).

> 2.    *Comity Among Courts Warrants Staying These Adversary Proceedings*
>
> a.    *The Court Should Defer to the Main Insolvency Proceedings in Anguilla*

The Court concludes that these Adversary Proceedings should be stayed in deference to the main insolvency proceedings in Anguilla.  "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of the United States citizens or violate domestic public policy." *CT Inv. Mgmt. Co., LLC. v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A. de C.V.)*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012) (citing *In re Atlas Shipping*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2008)).  The Second Circuit has "recognized one discrete category of foreign litigation that generally requires the dismissal of parallel district court actions—foreign bankruptcy proceedings." *Royal and Sun Alliance*, 466 F.3d at 92–93.  A foreign nation's interest in the "equitable and orderly distribution of a debtor's property" is an interest deserving of particular respect and deference, and accordingly, the Second Circuit has followed the general practice of United States courts and regularly defers to such actions. *Id.* at 93 (citing cases); *see also Duff & Phelps, LLC*, 18 F. Supp. 3d at 383 (holding that deference is warranted "[b]ecause the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding") (quotation marks and citations omitted).

"[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *Cozumel Caribe,* 482 B.R. at 114 (citing *Altos Hornos*, 412 F.3d at 424).  In analyzing procedural fairness, courts have looked to the following nonexclusive factors:

> (1) whether creditors of the same class are treated equally in the
> distribution of assets; (2) whether the liquidators are considered
> fiduciaries and are held accountable to the court; (3) whether
> creditors have the right to submit claims which, if denied, can be
> submitted to a bankruptcy court for adjudication; (4) whether the
> liquidators are required to give notice to the debtors potential
> claimants; (5) whether there are provisions for creditors meetings;
> (6) whether a foreign country's insolvency laws favor its own
> citizens; (7) whether all assets are marshalled before one body for
> centralized distribution; and (8) whether there are provisions for an
> automatic stay and for the lifting of such stays to facilitate the
> centralization of claims.

*Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249 (2d Cir. 1999).

Deference to the Anguilla Administrations is warranted here.  On February 22, 2016,

CCIB and PBT were placed under administration pursuant to section 31(b)(2) of the Financial

Services Commission Act, R.S.A. c. F28, and the High Court appointed the Foreign

Representative as administrator for PBT and CCIB.  (¶¶ 60−61; *PBT Compl.* ¶¶ 56−57.)  The

Administrator subsequently filed the PBT and CCIB chapter 15 petitions in this Court on May

26, 2016 and on October 11, 2016, respectively, seeking recognition of the PBT administration

and the CCIB administration in Anguilla.  (¶ 64; *PBT Compl.* ¶ 60.)  On June 17, 2016 and

November 15, 2016, the orders were entered in this Court, recognizing the PBT administration

(Case # 16-11529 (MG), ECF Doc. # 17 ("*PBT Recognition Order*")) and the CCIB

administration as foreign main proceedings.  (Case # 16-12844 (SMB), ECF Doc. # 16 ("*CCIB

Recognition Order*").).  Given the administration of PBT and CCIB in the Anguilla foreign main

insolvency proceedings, the Anguilla courts clearly have an interest in the "equitable and orderly

distribution" of the Debtors Banks' property; and deference to those proceedings is appropriate.

*See Royal and Sun Alliance*, 466 F.3d at 92−93.  Neither PBT nor CCIB dispute the procedural

fairness of the Anguilla main proceedings, nor does the record support any such contention.  *See*

*Altos Hornos*, 412 F.3d 418 (noting that, in assessing the fairness of Mexican proceedings,

"[n]othing in the record before us suggests that the actions taken by the Mexican bankruptcy court are not approved or allowed by American law").  This Court has already found Anguillan courts to be competent to adjudicate matters pending before them.  *See In re HBLS, L.P.*, 468 B.R. at 640 ("[T]he courts of Anguilla are available and competent to adjudicate these issues. There is thus no need for this Court to inject itself into proceedings that have already been or can be handled in Anguilla.").

NBA and CCB argue that a district court decision in *Madoff* supports staying these actions based on comity.  *See Sec. Inv'r Prot. Co. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 513 B.R. 222 (S.D.N.Y. 2014).  In *Madoff*, the district court denied the SIPA trustee's claim over foreign transfers based on the presumption against extraterritoriality of section 550(a) of the Bankruptcy Code, but added that even if the presumption was rebutted, the SIPA trustee's claim would be precluded by concerns of international comity.  *Id.* at 231.  The district court noted that the British Virgin Islands courts had already determined that debtor could not reclaim transfers made to its customers under certain common-law theories, a determination that was in conflict with the trustee's claim.  *Id.* at 232.  As such, the district court ruled that by filing the action to avoid the transfers before United States courts, the SIPA trustee was "seeking to use SIPA to reach around such foreign liquidations."  *Id.* at 231–32; *see also Altos Hornos*, 412 F.3d at 427 (explaining that "creditors may not use U.S. courts to circumvent foreign bankruptcy proceedings").

The Plaintiffs attempt to distinguish these cases from *Madoff*, arguing that a stay based on comity is inappropriate.  The Plaintiffs contend that comity may be appropriate to stay the exercise of bankruptcy court jurisdiction in circumstances such as in *Madoff*, where a creditor seeks to "reach around" foreign insolvency proceedings, but further contend that is it not the case

here: the "Administrator does not seek to compete with the Debtor's Anguillan estate," but "is

asserting the Debtor's own claims—not 'reaching around'—the Anguillan insolvency

proceeding." (*CCIB Opp'n to CCB's Mot. to Dismiss* at 27–28; *PBT's Opp'n to NBA's Mot. to

Dismiss* at 28.)

"Reaching around" can take multiple shapes and forms. That the claims in these

Adversary Proceedings are not brought by or in the interest of a creditor of PBT or CCIB, but by

debtors in possession, does not change the analysis. Indeed, the Plaintiffs do seek to reach

around the litigation in Anguilla. Because NBA and CCB are in receivership in Anguilla, the

Anguilla court has stayed the actions against those two entities in Anguilla. The Plaintiffs seek

to proceed against those two entities in the Adversary Proceedings—in effect, the Plaintiffs ask

this Court to disregard the stay entered by a court in Anguilla. The Plaintiffs have appealed the

stay order in Anguilla, but even if the stay is lifted, it is more appropriate that the Anguilla

Litigation proceed to judgment before this Court needs to address whether any issues remain to

be decided under federal or New York law. *See also Altos Hornos*, 412 F.3d at 427 (noting that

the recognition sought in the United States that lender owned the disputed funds would

determine how those funds were distributed to creditors and, therefore, such determination was

"precisely the sort of end-run around a parallel foreign bankruptcy proceeding of which we have

repeatedly disapproved").[22]

The Foreign Representative freely admits that he filed the Plaintiffs' chapter 11 cases to

allow him to bring the Adversary Proceedings and to assert constructive fraudulent transfer

claims under federal and New York law that, according to the Plaintiffs, have no counterpart and

---

[22]     Our bankruptcy courts take a dim view when parties outside the United States seek to avoid the effect of
the automatic stay in our cases; so too, our courts should be reluctant to ignore the effect of a stay issued by a
foreign court.

cannot be asserted under Anguilla law.  There is little doubt that by filing these Adversary

Proceeding in the United States, the Plaintiffs sought to litigate these cases despite the stay

imposed and the appeal pending in Anguilla.  Accordingly, the Court concludes, in the exercise

of its discretion, that international comity warrants staying these Adversary Proceedings in

deference to the Anguilla Administrations.[23]

---

[23]    The Court notes that the Second Circuit in *Altos Hornos* addressed the circumstances where it is appropriate for a United States court to defer to a foreign insolvency court to decide issues concerning the treatment of a foreign debtor's property in the United States.  *See Altos Hornos*, 412 F.3d 418.  In these Adversary Proceedings, as in *Altos Hornos*, the alleged transfers of funds supposedly took place in the United States between bank accounts located in New York.  The Second Circuit held that "the ownership of property a debtor claims as part of its estate in a foreign bankruptcy proceeding is a question 'antecedent to the distributive rules of bankruptcy.' Local courts may resolve the question because international comity does not require deference to the parallel foreign bankruptcy proceeding in such circumstances." *Altos Hornos*, 412 F.3d at 420 (quoting *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag)*, 961 F.2d 341, 349 (2d Cir. 1992)).  The *Altos Hornos* court explained that this rule only applies to disputes that present a *bona fide* question of property ownership.  *Id.* However, the Second Circuit's holding on federal courts' power to adjudicate a *bona fide* dispute of property of a foreign debtor was decided and is only applicable in the context of an ancillary bankruptcy proceeding filed in the United States, either under former Bankruptcy Code section 304 or current chapter 15 of the Bankruptcy Code, which replaced section 304.  *See, e.g., In re Petition of Wuthrich*, 337 B.R. 262, 267 (Bankr. S.D.N.Y. 2006) (explaining that "comity is not implicated by every question presented in a § 304 proceeding," but that "U.S. courts may resolve *bona fide* questions of property ownership arising under local law while a foreign bankruptcy proceeding is ongoing without deferring to the parallel foreign proceeding on grounds of international comity") (citing *Altos Hornos*, 412 F.3d at 426).  Despite recognition by this Court of the Anguilla Administrations, these Adversary Proceedings were filed in plenary chapter 11 cases, not chapter 15 cases.  Further, even assuming that *Altos Hornos* controls in these chapter 11 cases, the Court is uncertain, and does not decide, whether the fraudulent conveyance claims brought by the Plaintiffs are *bona fide* claims of property which warrant adjudication by a national court.  As explained elsewhere in this Opinion, it is unclear whether the Debtors have a property interest in the deposits in their parent companies' New York bank accounts sufficient to trigger application of federal or state avoidance statutes.  The *Complaints* are unclear when and how the Debtors' customer funds were deposited in the New York bank accounts.

       b.      *The Adversary Proceedings Should Be Stayed Pending the*
              *Resolution of the Anguilla Litigation*

While deference to the main insolvency proceedings in Anguilla warrants a stay of these

Adversary Proceedings, the Court also finds, in the exercise of its discretion, that deference to

the related Anguilla Litigation justifies a stay of these cases pending resolution of the Anguilla

Litigation.

The Second Circuit has articulated nonexclusive factors that courts should consider in

evaluating a request for dismissal based on a parallel proceeding in a foreign nation. These

factors include:

> the similarity of the parties, the similarity of the issues, the order in
> which the actions were filed, the adequacy of the alternate forum,
> the potential prejudice to either party, the convenience of the
> parties, the connection between the litigation and the United States,
> and the connection between the litigation and the foreign
> jurisdiction.

*Royal and Sun Alliance*, 466 F.3d at 94 (citations omitted). "This list is not exhaustive, and a

[bankruptcy] court should examine the 'totality of the circumstances' to determine whether the

specific facts before it are sufficiently exceptional to justify abstention." *Id.* (quoting *Finova*

*Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 900 (7th Cir. 1999)). The

Supreme Court has similarly recognized that a decision to abstain from exercising jurisdiction

based on the existence of parallel litigation "does not rest on a mechanical checklist, but on a

careful balancing of the important factors . . . as they apply in a given case, with the balance

heavily weighted in favor of the exercise of jurisdiction." *Id.* (quoting *Moses H. Cone*, 460 U.S.

at 16); *see also Colorado River*, 424 U.S. 818–19 ("No one factor is necessarily determinative; a

carefully considered judgment taking into account both the obligation to exercise jurisdiction and

the combination of factors counselling against that exercise is required.") (citation omitted).

While *Royal and Sun Alliance* outlined the factors in the context of a motion to dismiss, rather than to stay the action, the analysis still applies. *Tarazi v. Truehope Inc.*, 958 F. Supp. 2d 428, 433–34 (S.D.N.Y. 2013) (collecting cases) (staying domestic actions in favor of Canadian courts). However, the factors may be weighted differently when a stay, rather than dismissal, is considered. *Id.* at 434 (citing *Royal and Sun Alliance*, 466 F. 3d at 96–97 (suggesting that stay rather than dismissal might be merited); *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Kozeny*, 115 F. Supp. 2d 1243, 1248 (D. Colo. 2000) (weighting adequacy of foreign forum in light of fact that court was staying, rather than dismissing, domestic action); *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 254 (D. Mass. 1999) (same)). The Court finds that the balancing of the *Royal and Sun Alliance* factors in these Adversary Proceedings favors a stay of the Adversary Proceedings in New York pending the outcome of the Anguilla Litigation.

### i.    Similarities of Parties

The similarity between the parties involved in the foreign and domestic actions favors a stay of the Adversary Proceedings. The parties to the Anguilla Initial Proceedings are PBT and CCIB as plaintiffs, and NBA, CCB and NCBA as defendants. The parties to the Judicial Review are plaintiffs PBT and CCIB, and defendant ECCB, among others. In the Satay Action, ECCB is named as defendant and is the only party in those proceedings that is also a party to the Adversary Proceedings. The Adversary Proceedings include each of those parties.

"For two actions to be considered parallel, the parties in the actions need not be the same, but they must be *substantially* the same, litigating substantially the same issues in both actions." *Royal and Sun Alliance*, 466 F.3d at 94 (emphasis added); *see also Advantage Intern. Mgmt Inc. v. Martinez*, 1994 WL 482114, at *4 (S.D.N.Y. Sept. 7, 1994) ("All that is required in this Circuit is that the parties and issues be sufficiently similar so that when a judgment issues from

56

the foreign court, res judicata will apply."); *Herbstein v. Bruetman*, 743 F. Supp. 184, 188

(S.D.N.Y. 1990) ("[C]omity requires that the parties and issues in both litigations are the same or

sufficiently similar, such that the doctrine of *res judicata* can be asserted.") (citation omitted).[24]

All parties in these Adversary Proceedings, other than ECCB, are parties in the Anguilla

Initial Proceedings.  While ECCB is a defendant in the Satay Action, neither the Debtors nor any

other Defendants in these actions are parties in that proceeding.  However, PBT and CCIB have

sued ECCB in Anguilla as part of the *Judicial Review Application*.  In any event, the actions

pending in Anguilla revolve around the disputed issues in the present Adversary Proceedings,

and even if there are minor differences in the parties in those proceedings, the judgments of the

Anguilla High Court would nevertheless be instructive to this Court (or even dispositive) in

resolving the issues before it, including those involving ECCB.  Moreover, while ECCB's

argument that it is not subject to personal jurisdiction in this Court cannot be fully resolved now,

there may be no basis to keep ECCB in these Adversary Proceedings.  The Foreign

Representative argues that there are currently no claims pending against CCB and NBA by the

Debtors in Anguilla in light of the High Court's decision to deny the application for leave to

assert claims against CCB and NBA.  (*CCIB's Opp'n to CCB's Mot. to Dismiss* at 30 n.16;

*PBT's Opp'n to NBA's Mot. to Dismiss* at 30 n.13.)  But the Plaintiffs have appealed the High

Court's decision.  If the Court of Appeal in Anguilla grants relief to PBT and CCIB, and the

parties are allowed to litigate before the High Court, the Defendants would be faced with having

to defend actions in two fora.  The Court thus finds that the parties in these Adversary

---

[24]    Issues of "substantial similarity" between parties for purposes of comity analysis usually arise when parties in foreign and national actions are "affiliates or have a similarly close relationship"; in those circumstances, courts deem parties similar for comity purposes.  *See Tarazi*, 958 F. Supp. 2d at 434 (collecting cases).  This is, however, not an issue in these Adversary Proceedings.

57

Proceedings and Anguilla Litigation are clearly sufficiently similar. This factor weights in favor of staying the Adversary Proceedings.

ii.    *Similarities of Issues*

Likewise, the similarity between the issues litigated in the foreign and domestic actions favors a stay of the Adversary Proceedings. As explained in *Royal and Sun Alliance*, "[f]or two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating *substantially* the same issues in both actions." 466 F.3d at 94 (emphasis added) (citations omitted). In *Ole Media*, the court found that there was substantial similarity between the cases because the determination of the issue presented by the Canada action would have a significant bearing and *res judicata* effect, on the dispute in the New York action. 2013 WL 2531277, at *4 (holding that although the New York action included an issue not present in the Canadian action, the imposition of a stay would "not prevent the additional issue from being litigated before th[e] [New York] [c]ourt. Instead, it w[ould] permit an underlying dispute to be resolved first, one which is likely . . . to prove either 'instructive on the ultimate resolution' of th[e] [New York] action or largely dispositive.") (citation and footnote omitted). When the issues litigated in the foreign and domestic proceedings are not completely similar, dismissal of the action is inappropriate, but a stay may be warranted. *See id.* at *4 (citing *Palm Bay Int'l v. Marchesi Di Barolo S.P.A.*, 659 F. Supp. 2d 407, 414 (E.D.N.Y. 2009) (concluding that where domestic action included an issue not presented by foreign dispute, dismissal of domestic action was not appropriate)).

The litigation of these Adversary Proceedings involves the same subject matter and revolves around the same issues as the actions currently being litigated before the courts in Anguilla: whether the Plaintiffs have a proprietary interest in the deposits that were allegedly

upstreamed to the parent banks, NCBA and ECCB, and whether the Conservator Directors

violated their fiduciary duties and Anguillan law by transferring the Debtor Banks' Funds to the

Parent Banks.  The resolution of the Anguilla Litigation will prove highly instructive, if not

completely dispositive, on the ultimate resolution of these Adversary Proceedings.  The Plaintiffs

argue that the relief requested is not warranted because "[a]ll of the claims in this Adversary

Proceeding could not be litigated in Anguilla because it does not recognize constructive

fraudulent conveyance claims." (*CCIB's Opp'n to CCB's Mot. to Dismiss* at 30 n.16; *PBT's

Opp'n to NBA's Mot. to Dismiss* at 30 n. 13.)  Yet, both United States courts and Anguilla courts

provide essentially the same remedy that the Plaintiffs seek, regardless of the underlying causes

of action.  If intentional fraud is proven in Anguilla, the Debtor Banks' remedy would be the

same as if it proceeded under either intentional or constructive fraud provisions of the

Bankruptcy Code and New York law—the money the Plaintiffs allege belonged to them would

be transferred back to the bankruptcy estates.  It is irrelevant that Anguilla law does not

recognize constructive fraudulent transfer claims, as adequate relief is available in Anguilla.  The

Court accordingly finds that the issues in the Adversary Proceedings and Anguilla Litigation are

similar.  This factor thus weights in favor of staying the Adversary Proceedings.

### iii.    Order of Filing

Courts "have traditionally accorded great weight to the first suit filed." *Tarazi*, 958 F.

Supp. 2d at 436 (citation omitted).  However, the importance of this factor is reduced when the

relevant actions were filed in close temporal proximity to one another and where the first-filed

action has not "reached a more advanced stage" than the later action. *Id.* (citation omitted).

Additionally, "[t]he first-filed doctrine is considered, perhaps with less force, in the international

cross-border context*." MF Glob. Holdings Ltd. v. Allied World Assurance Co. (In re MF Glob.*

*Holdings Ltd.)*, 561 B.R. 608, 628 (Bankr. S.D.N.Y. 2016), *leave to appeal denied*, No. 17 CIV.

106, 2017 WL 548219 (S.D.N.Y. Feb. 10, 2017); *see also Taub v. Marchesi Di Barolo S.P.A.*,

No. 09–CV–599, 2009 WL 4910590, at *6 (E.D.N.Y. Dec. 10, 2009) (analyzing principles and

factors relating to international comity and parallel proceedings, and affording "minimal weight"

to the temporal sequence of filings).

Here, the Anguilla Initial Proceedings was filed on May 6, 2016, and the Satay Action

was filed on June 28, 2016, approximately seven to eight months and five months, respectively,

before these Adversary Proceedings were filed on December 16, 2016 (before Judge Glenn) and

on January 5, 2017 (before Judge Bernstein). The *Judicial Review Application* was filed on

March 10, 2017, three to four months *after* these Adversary Proceedings. The fact that two of

the proceedings in Anguilla were filed several months before these Adversary Proceedings, and

that one was filed some months after, slightly supports staying the Adversary Proceedings in

favor of the proceedings in Anguilla. Further, while the High Court of Anguilla already has

addressed some of the parties' arguments and objections,[25] there is no suggestion that substantial

activity has taken place in the Anguilla proceedings. *See Thornton Tomasetti, Inc. v. Anguillan*

*Dev. Corp.*, 2015 WL 7078656, at *4 (S.D.N.Y. Nov. 13, 2015) (observing, where the Anguillan

proceeding was filed three months before the domestic one, that "[a]n appeal of the motion to

dismiss in the Anguillan case has been pending . . . though there is no suggestion that discovery

has yet taken place. Accordingly, the Anguilla action was filed and some progress has been

---

[25]    On August 24, 2016, the High Court entered the *Leave Order*, staying the case under section 143(c) of the
Banking Act of 2015 because the parent banks were in receivership. It is currently subject to an appeal before the
Court of Appeal in Anguilla. In the Satay Action, the High Court heard and addressed the defendants' application
dated August 12, 2016 seeking a declaration that the High Court lacked jurisdiction based on the defendants'
statutory immunity. The High Court refused the defendants' objection, and although the defendants in these cases
were directed to serve their defense, the defendants filed and were granted leave to appeal that decision. On June
14, 2017, the High Court stayed the Judicial Review until the earlier of either a "final determination" in these
adversary proceedings or a final settlement agreement between the parties to these cases. (*Judicial Review Appl.* at
5.)

made in that case[]" and concluding that "[t]his factor weighs slightly in favor of a stay") (citing *Vill. Of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999) ("This factor does not turn exclusively on the sequence in which the cases were filed, but rather in terms of how much progress has been made in the two actions.")). On the other hand, this Court has already heard the parties' arguments on the *Motion to Dismiss*. On balance, the Court thus considers this factor to be neutral.

### iv.    Adequacy of Anguilla Forum

The Court has already examined the adequacy of the Anguilla forum in the context of the *forum non conveniens* analysis above. For the reasons set forth in the *forum non conveniens* analysis, the Court holds that Anguilla is an adequate forum for the litigation of the subject matter of the dispute. This factor thus favors staying the Adversary Proceedings.

### v.    Convenience of, and Potential Prejudice to, Either Party

The inconvenience of New York courts to Anguillan parties and the relative prejudice to litigate the subject matter of the litigation in a foreign country also favor a stay of these Adversary Proceedings. The Plaintiffs, discussing *forum non conveniens*, contend that "the documentary evidence and witnesses necessary to follow the Debtors' money will be located in the United States, and especially in New York[,]" and that "[i]n any event, Defendants are sophisticated global institutions for whom producing documents or witnesses in any forum poses no special inconvenience." (*CCIB's Mem. of Law in Opp'n to ECCB's Mot. to Dismiss* at 31; *PBT's Mem. of Law in Opp'n to the ECCB's Mot. to Dismiss* at 27–28.) However, for the reasons set forth in the *forum non conveniens* analysis, the Court finds that there is little reason to find that New York is a convenient forum for the Plaintiffs.

Turning to the potential prejudice to the parties, NBA and CCB argue, in the context of

the *forum non convenience* analysis, that "[i]t makes no sense for the parties to fly back and forth

from Anguilla to New York and pay New York lawyers to litigate over Anguilla law when [the

Plaintiffs'] claims can and should be resolved in Anguilla." (Me*m. of Law in Supp. of CCB's

Mot. to Dismiss* at 21; *Mem. of Law in Supp. of NBA's Mot. to Dismiss* at 18.)  However, the

inconvenience and expense associated with parallel proceedings do not constitute prejudice

justifying deference to a parallel foreign litigation.  *See Tarazi*, 958 F. Supp. 2d at 438 (citing

*Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2006) (noting that the

burden of litigating simultaneously in two forums is not sufficient prejudice to weigh in favor of

stay)); *compare National Union Fire Insurance Co*, 115 F. Supp. 2d at 1249 (concluding that

less access to discovery and unavailability of jury trial in foreign court weighs against stay), *and

Goldhammer*, 59 F. Supp. 2d at 255 (concluding that less access to discovery in foreign forum

weighs against stay).  Given that no party has identified any prejudice it will suffer if it does not

prevail on these *Motions to Dismiss*, and because New York is not a convenient forum for the

Plaintiffs or the Defendants, this factor weighs in favor of a stay of the Adversary Proceedings.

> vi.    *Connection Between the Litigation and the United States and
>        Anguilla*

The facts alleged in the *Complaints* implicate conduct in both Anguilla and the United

States.  The Plaintiffs and all Defendants are based in Anguilla, and the solvency, integrity, and

regulation of the Anguilla banks in a period of dire economic circumstances are of paramount

interest to Anguilla.  The allegations in the *Complaints* about the ownership and flow of funds of

the alleged transfers is unclear, and will require amendments of the *Complaints* if these cases are

reactivated here after the decisions of the Anguilla courts.  It is certainly true that New York and

the United States have a strong interest in the integrity of the banking system in New York and

the United States.  Some or most of the transfers for which recovery is sought were allegedly made between bank accounts in New York, so it appears that the alleged damages occurred in the United States.[26]  However, even if the transfers at issue are "domestic," it does not change the fact that Anguilla has an exceedingly strong interest in this case—the parties are from Anguilla, the conduct at issue was directed from Anguilla, Anguilla has a paramount interest in regulating the conduct of its banks, and Anguilla has a strong interest in having disputes involving its banking system resolved in its courts.  *See Gilbert*, 330 U.S. at 509 (stating that under the *forum non conveniens* doctrine, "[t]here is a local interest in having localized controversies decided at home"); *see also Thornton Tomasetti*, 2015 WL 7078656, at *5 (staying the domestic action where "[t]he Anguillan case resolves virtually identical issues between identical parties, and this dispute has only a tenuous connection to the United States") (citation omitted).  This factor thus favors a stay of these Adversary Proceedings.

### vii.    Balance of Factors

Evaluating the *Royal and Sun Alliance* factors as a whole, the Court concludes that they strongly favor staying the action in deference to the pending proceedings and litigation in Anguilla courts.  Even where courts have declined to dismiss an action because of a prior parallel action in a foreign court, a stay has often been viewed as the appropriate intermediate measure. *Ole Media*, 2013 WL 2531277, at *6 (citing cases including *Royal and Sun Alliance*, 466 F.3d at 96 ("[A] measured temporary stay need not result in a complete forfeiture of jurisdiction.  As a

---

[26]    *Cf. Bascuñán v. Elsaca*, 874 F.3d 806, 820–21 (2d Cir. 2017) (concluding that for purposes of RICO injury, injury was domestic where money was taken from bank accounts in New York even though plaintiffs and defendants were in Chile; applying Restatement (Second) of Conflicts of Laws § 147 *cmt. e*, "[w]here the injury is to tangible property, we conclude that, absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad"); RESTATEMENT (SECOND) OF CONFLICTS OF LAWS (1971) § 147 *cmt. e* ("*When conduct and injury occur in different states.*  For reasons stated in § 146, Comment *e*, the local law of the state where the injury occurred to the tangible thing will usually be applied to determine most issues involving the tort (see § 145, Comments *d-e* and §§ 156–66, 172) on the rare occasions when conduct and the resulting injury to the thing occur in different states.").

lesser intrusion on the principle of obligatory jurisdiction, which might permit the district court a window to determine whether the foreign action will in fact offer an efficient vehicle for fairly resolving all the rights of the parties, such a stay is an alternative that normally should be considered before a comity-based dismissal is entertained.")).  Based on these facts, the Court concludes, in the exercise of its discretion, that these Adversary Proceedings should be stayed based on international comity pending the outcome of the Anguilla Litigation.  Not only do the Anguilla courts have a superior interest in the equitable and orderly distribution of the Debtors' assets as part of the Anguilla Administrations, but deference should also be granted to the pending Anguilla Litigation.

## IV.   CONCLUSION

For the reasons explained above, the Court concludes, based on *forum non conveniens* and international comity, that the disputes between the parties should be adjudicated in the first instance in the courts of Anguilla.  Therefore, both Adversary Proceedings are stayed.

Counsel for the parties shall file joint status reports with this Court in each of these Adversary Proceedings every ninety (90) days from the date of this Opinion reporting on the status of proceedings in the Anguilla courts.

**IT IS SO ORDERED.**

Dated:      January 29, 2018
            New York, New York

/s/ *Stuart M. Bernstein*_____
            STUART M. BERNSTEIN
            United States Bankruptcy Judge

/s/ *Martin Glenn*_____
            MARTIN GLENN
            United States Bankruptcy Judge